*808 OPINION OF THE COURT
Rosenblatt, J.
On this appeal we address the authority of the Governor to enter into agreements with Indian tribes to permit casino gaming on Indian reservations. Plaintiffs are legislators, organizations and individuals opposed to casino gambling. In challenging the Governor’s authority, they contend that by negotiating and signing the agreements without legislative authorization or approval, Governor Mario M. Cuomo in 1993 and Governor George E. Pataki in 1999 violated the principle of separation of powers under the State Constitution {see NY Const, art III, § 1; art IV, § l).[1] In response, the Governor and the other defendants (collectively, the State) argue that plaintiffs may not bring this action for a variety of procedural reasons and that in any event the agreements were consistent with the separation of powers. After setting forth the background of the case, we address the procedural issues and then turn to the merits.
I. Factual and Statutory Background
On October 15, 1993, then-Governor Cuomo entered into the “Tribal-State Compact Between the St. Regis Mohawk Tribe and the State of New York.” The compact, which underlies this appeal, is an outgrowth of the Federal Indian Gaming Regulatory Act (IGRA) (25 USC §§ 2701-2721; 18 USC §§ 1166-1168), and allows the Tribe to conduct gambling, including baccarat, blackjack, craps and roulette, on the Akwesasne Reservation in Franklin County.
In response to the United States Supreme Court’s decision in California v Cabazon Band of Mission Indians (480 US 202 [1987]), Congress passed IGRA, which declares that “Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity” (25 USC § 2701 [5]). IGRA provides statutory *809 authorization for the establishment of Indian casinos, attempts to regulate the gaming so as to avoid “corrupting influences” and seeks to ensure that the Indian tribes are the primary beneficiaries of the gaming (see 25 USC § 2702).
IGRA requires a compact between a tribe and the state before the tribe will be permitted to conduct “Class III” gaming, which includes the Las Vegas-style gaming at issue here.[2] When a tribe requests that a compact be negotiated, a state is required to do so in good faith (see 25 USC § 2710 [d] [3] [A]). The compact should resolve such matters as the applicability of state laws at the casinos, state taxation of gambling revenues, remedies for breach of contract and “any other subjects that are directly related to the operation of gaming activities” (25 USC § 2710 [d] [3] [C] [i]-[vii]). IGRA authorizes compacts only in “State[s] that permití] such gaming for any purpose by any person, organization, or entity” (25 USC § 2710 [d] [1] [B]).
According to the terms of the 1993 compact, the New York State Racing and Wagering Board, the New York State Police and the St. Regis Mohawk Tribal Gaming Commission were vested with gaming oversight. Law enforcement responsibilities fell under the cognizance of the State Police, with some law enforcement matters left to the Tribe. As required by IGRA, the compact was approved by the United States Department of the Interior before it took effect.
The Tribe opened its casino on April 10, 1999. On May 27, 1999, Governor Pataki[3] and the Tribe executed an amendment to the 1993 compact. The Interior Department approved the amendment, which allowed the casino to operate electronic class III games, including keno. By its terms, the amendment expired on May 27, 2000, one year after it was signed. Although the Governor and the Tribe later agreed to two additional amendments, the Interior Department disapproved them. As a result, there is no authorization in effect allowing the Tribe to operate electronic gaming. Nevertheless, the parties inform us that electronic gaming continues at the casino.
*810 Shortly after the 1999 amendment took effect, plaintiffs brought suit asserting that the 1993 compact and the 1999 amendment violated the separation of powers and the constitutional gambling prohibition. They sought a declaration that the 1993 compact and the 1999 amendment were unconstitutional, and an injunction prohibiting the State from expending any money in furtherance of the agreements. They also asked the court to enjoin the Governor from taking any further unilateral action (such as signing a successor to the 1999 amendment) that would extend gambling in the state.
By judgment entered March 10, 2000, Supreme Court dismissed the action for plaintiffs’ failure to join the Tribe as an indispensable party (see generally CPLR 1001). On appeal, the Appellate Division reversed, concluding that the Tribe was not an indispensable party, noting that a contrary ruling would put Indian gaming compacts beyond constitutional challenge or review (see Saratoga County Chamber of Commerce v Pataki, 275 AD2d 145, 151-154 [2000] [Saratoga 7]). While the Appellate Division acknowledged that the Tribe’s interests would be affected by the suit, it determined that, on balance, the Tribe’s absence should not prevent the suit from going forward. The Court also rejected the State’s statute of limitations, standing and laches defenses (see id. at 154-158).
On remand, by order entered April 12, 2001, Supreme Court granted plaintiffs summary judgment. The court declared the 1999 amendment and the 1993 compact void and unenforceable, and enjoined the Governor from taking any further action to reenact an electronic gaming amendment without legislative approval. The Appellate Division affirmed, holding that the Governor’s unilateral action deprived the Legislature of its policymaking authority in such areas as “the location of the casino, the gaming that could be carried on there, the extent of state involvement in providing regulation * * * and the fees to be exacted for that regulation” (Saratoga County Chamber of Commerce v Pataki, 293 AD2d 20, 26 [2002] [Saratoga 77]). The State appealed as of right, bringing up for review the substantial constitutional question presented.
II. Mootness
The jurisdiction of this Court extends only to live controversies (see Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608, 72 NY2d 307, 311 [1988]; Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713-714 [1980]). We are thus prohibited from giving advisory opinions or ruling on “academic, hypo *811 thetical, moot, or otherwise abstract questions” (Hearst Corp., 50 NY2d at 713). Accordingly, where changed circumstances prevent us “from rendering a decision which would effectually determine an actual controversy between the parties involved,” we will dismiss the appeal or reverse the lower court order and direct that court to dismiss the action (Karger, Powers of the New York Court of Appeals § 71 [a], at 426 [3d ed]).
A. 1999 Amendment
Plaintiffs’ challenges to the 1999 amendment are moot. The amendment expired in May 2000, and in the intervening three years no similar agreement has gone into effect. A declaration as to the validity or invalidity of the 1999 amendment would therefore have no practical effect on the parties. Granted, a declaration as to the Governor’s ability to negotiate amendments to the compact would provide beneficial advice to future officials who will have to make decisions about this casino and other similar projects. This is true, however, of all requests for advisory opinions.
In Hearst we recognized that the mootness prohibition is subject to an exception, by which we have discretion to review a case if the controversy or issue involved is likely to recur, typically evades review, and raises a substantial and novel question (see 50 NY2d at 714-715; see also Wisholek v Douglas, 97 NY2d 740, 742 [2002]). In that event, a court may reach the moot issue even though its decision has no practical effect on the parties (see Hearst, 50 NY2d at 714-715). Plaintiffs here ask us to apply the Hearst mootness exception and address the validity of the 1999 amendment, arguing that the Governor’s two unsuccessful attempts to extend the amendment demonstrate a high likelihood of recurrence. They further contend that the one-year length of both the 1999 amendment and the two proposed amendments makes judicial review impracticable.
These are cogent assertions but we are unpersuaded that this controversy is so likely to evade review as to justify our departure from the standard rules of mootness. We are confident that lower courts, if asked by the parties, will expedite consideration of any future agreement, so as to maximize the chances that a judicial resolution will be available during the life of the agreement. More importantly, however, in light of our determination with respect to the 1993 compact (point VII below), there is no reason to believe that the Executive Branch will execute future agreements unilaterally, and therefore the precise issues presented by plaintiffs’ *812 challenge to the 1999 amendment may never again recur. Accordingly, we decline to reach that portion of plaintiffs’ suit that challenges the validity of the 1999 amendment, and we vacate that portion of the Appellate Division order that declared the 1999 amendment void and unenforceable.
B. 1993 Compact
Plaintiffs’ challenge to the 1993 compact undisputedly presents a live controversy. Without a valid Tribal-State compact, IGRA does not permit the operation of a casino.[4] Therefore, a declaration that the 1993 compact violates the State Constitution speaks to the legality of the casino’s operation, and thus affects the rights of each party to this suit. Where, as here, a judicial determination carries immediate, practical consequences for the parties, the controversy is not moot (see Matter of Johnson v Pataki, 91 NY2d 214, 222 [1997]).
We now proceed to address plaintiffs’ standing.
III. Standing
Standing to sue is critical to the proper functioning of the judicial system. It is a threshold issue. If standing is denied, the pathway to the courthouse is blocked. The plaintiff who has standing, however, may cross the threshold and seek judicial redress. It is difficult to draw an exquisitely sharp line separating the worthy litigant from one who would generate a lawsuit to advance someone else’s cause. The rules governing standing help courts separate the tangible from the abstract or speculative injury, and the genuinely aggrieved from the judicial dilettante or amorphous claimant.
For generations, New York courts have treated standing as a common-law concept,[5] requiring that the litigant have something truly at stake in a genuine controversy.[6] We have addressed the issue in a number of contexts, including standing for organizations and associations (see Matter of Aeneas *813 McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d 326 [1998]; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761 [1991]), legislators (see Silver v Pataki, 96 NY2d 532 [2001]), voters (see Matter of Schulz v New York State Exec., 92 NY2d 1 [1998]) and in challenges to administrative actions (see Matter of Colella v Board of Assessors, 95 NY2d 401 [2000]; Rudder v Pataki, 93 NY2d 273 [1999]; Matter of New York Assn. of Convenience Stores v Urbach, 92 NY2d 204 [1998]; Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668 [1996]).
A number of organizations, legislators and citizen-taxpayers are plaintiffs in this action and the State has contested standing as to all of them. Because we conclude that the citizen-taxpayers have standing, it is not necessary to address the State’s challenge as to the other plaintiffs (see County of Rensselaer v Regan, 80 NY2d 988, 991 n [1992]).
Unlike other plaintiffs, citizen-taxpayers need not demonstrate an injury-in-fact to acquire standing. Instead, pursuant to State Finance Law § 123-b (1), a citizen-taxpayer may bring suit to prevent the unlawful expenditure of state funds “whether or not such person is or may be affected or specially aggrieved” by the challenged action. We have noted that while the statute might be read to allow actions when little or no injury has been claimed, courts have been inhospitable to plaintiffs who seek essentially to challenge nonfiscal activities by invoking the convenient statutory hook of section 123-b (see Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579, 589 [1998]). Accordingly, we have held that a plaintiff’s claims must have a “sufficient nexus to fiscal activities of the State” in order to confer standing (Rudder v Pataki, 93 NY2d at 281). A contrary rule would disrupt government operation by posing the threat of litigation to challenge any governmental action.
The task, of course, is to distinguish between cases that present a challenge to the expenditure of money and those that use the expenditure of money as a pretense to challenge a governmental decision. As we have said, “it is one thing to have standing to correct clear illegality of official action and quite another to have standing in order to interpose litigating plaintiffs and the courts into the management and operation of public enterprises” (Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992 [1976]). Accordingly, a claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing, but a claim that it is illegal *814 to spend money at all for the questioned activity likely would provide the plaintiff with standing. Here, the citizen-taxpayers have sufficiently alleged a challenge to the expenditure of state money to withstand the State’s motion to dismiss for lack of standing.
Another reason informs our conclusion. Were we to agree with the State and deny standing as to all plaintiffs in this action, an important constitutional issue would be effectively insulated from judicial review, something we cautioned against in Boryszewski v Brydges (37 NY2d 361, 364 [1975]). Plaintiffs allege that the Governor has acted ultra vires, exceeding the grant of authority that the Constitution gives to the Executive Branch. In separation of powers disputes of this kind, there will ordinarily be few who can claim concrete injury resulting from a breach of the constitutional division of authority. As a party to the 1993 compact but not to this suit, the Tribe signed the agreement and twice sought to extend most terms of the 1999 amendment. The Tribe is therefore an unlikely plaintiff. Others who could be considered harmed by casino gambling may be too remotely affected to gain relief in the courts.
The case before us contrasts sharply with Matter of Colella v Board of Assessors (95 NY2d 401, 410-411 [2000]), where we denied standing, holding that granting it would “permit challenges to the determinations of local governmental officials having no appreciable public significance beyond the immediately affected parties.” The issues in the present dispute are fundamental and of immense public significance.
It follows that our doctrines governing standing must be sensitive to claims of institutional harm. Actions of this type can serve as a means for citizens to ensure the continued vitality of the constraints on power that lie at the heart of our constitutional scheme (cf. Matter of Dairylea Coop, v Walkley, 38 NY2d 6, 10 [1975]; Committee for an Effective Judiciary v State, 209 Mont 105, 112-113, 679 P2d 1223, 1227 [1984]; State ex rel. Howard v Oklahoma Corp. Commn., 614 P2d 45, 52 [Okla 1980]). Thus, where a denial of standing would pose “in effect * * * an impenetrable barrier to any judicial scrutiny of legislative action,” our duty is to open rather than close the door to the courthouse (see Boryszewski, 37 NY2d at 364; see also State ex rel. Clark v Johnson, 120 NM 562, 904 P2d 11 [1995]; Rios v Symington, 172 Ariz 3, 833 P2d 20 [1992]; State ex rel. Sego v Kirkpatrick, 86 NM 359, 363, 524 P2d 975, 979 [1974]).
*815 Here, the citizen-taxpayer plaintiffs argue that the expenditure of state funds and the use of state regulatory personnel for the casino violate the New York Constitution. If standing doctrine precludes them from bringing this suit, the casino will remain operating indefinitely whether or not the 1993 compact was constitutional. Standing is properly satisfied here, lest procedural hurdles forever foreclose adjudication of the underlying constitutional issue. We next address the statute of limitations argument.
IV. Statute of Limitations
The State claims that this suit should have been brought as a CPLR article 78 proceeding, and that as such, the four-month statute of limitations must be applied and the suit dismissed as time-barred (see e.g. CPLR 217; Solnick v Whalen, 49 NY2d 224, 229-230 [1980]). We disagree because article 78 does not provide plaintiffs a way of obtaining the relief they seek. Where “no other form of proceeding exists for the resolution of the claims tendered in the declaratory judgment action, the six-year limitation of CPLR 213 (subd 1) will then be applicable” (Solnick, 49 NY2d at 230).
Plaintiffs seek a declaration as to the unconstitutionality of the 1993 compact and an injunction against the use of state funds to implement it. That relief cannot be afforded under CPLR article 78. The closest remedy contained in article 78 is prohibition, where an official is proceeding “without or in excess of jurisdiction” (CPLR 7803 [2]). We have held, however, that article 78 may not be used against executive officials, and plaintiffs would therefore have been unable to use article 78 to challenge the Governor’s signing of the compact (see Matter of Morgenthau v Erlbaum, 59 NY2d 143, 147 [1983]; Matter of Dondi v Jones, 40 NY2d 8, 13 [1976]; see also Sears v Hull, 192 Ariz 65, 68-69, 961 P2d 1013, 1016-1017 [1998]). Accordingly, the article 78 statute of limitations does not apply. That being so, plaintiffs’ declaratory judgment action falls within the residuary six-year statute of limitations period under CPLR 213 (1) (see Vigilant Ins. Co. v Housing Auth., 87 NY2d 36, 42 [1995]; see also Solnick, 49 NY2d at 230; Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3001:18, at 446).
The 1993 compact was signed on October 15, 1993, and published in the Federal Register on December 13, 1993. IGRA provides that a compact is not “final” until published in the Federal Register (25 USC §2710 [d] [1] [A] [in]; [2] [B]). *816 Plaintiffs filed suit on September 23 and 24, 1999, which fell within the limitations period. A suit brought in compliance with the statute of limitations may nonetheless be barred by laches, so we proceed to address that issue.
V. Laches
Laches and limitations are not the same. Limitations involve the fixed statutory periods within which actions must be brought, while laches signifies a delay independent of statute (see Siegel, NY Prac § 36, at 44 [3d ed 1999]; 2A Carmody-Wait 2d, NY Prac § 13:4, at 94 [2001]). We have defined laches as an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party (see Matter of Barabash, 31 NY2d 76, 81 [1972]; see also Matter of Dreikausen v Zoning Bd. of Appeals, 98 NY2d 165, 173 n 4 [2002]). The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches (see Galyn v Schwartz, 56 NY2d 969, 972 [1982]; Sorrentino v Mierzwa, 25 NY2d 59 [1969]; Skrodelis v Norbergs, 272 AD2d 316 [2d Dept 2000]). The defense has been applied in equitable actions and declaratory judgment actions (both of which are governed by the six-year catchall provision of CPLR 213 [1]) where the defendant shows prejudicial delay even though the limitations period was met.[7]
The State claims that the nearly six-year delay between the effective date of the 1993 compact and the start of this suit has prejudiced the Tribe. The Appellate Division refused to consider the effect of any prejudice to the Tribe, concluding that the State lacked the authority to raise a claim of prejudice on behalf of a nonparty. We conclude that the State has the power to argue that prejudice to a nonparty bars this action, *817 but that in this instance there has been no prejudice to the Tribe warranting dismissal.
In Matter of Schulz v State of New York (81 NY2d 336, 348-350 [1993]), we held that the prejudice caused by sales of bonds between the effective date of a law authorizing those bonds and the institution of the challenge to the law (one year later) was sufficient prejudice to bar the action. The Court held that the impact on the State as well as on the investors, “with whom the State engaged in these multimillion dollar financing transactions,” was enough to spell out laches {id. at 348). We thus recognized that harm to economic interests can be enough to bar an action on laches grounds, even if the delay does not affect a defendant’s ability to defend against a suit.
Nowhere in the present case, however, is there any indication that the delay in bringing tids action has caused the slightest harm to the Tribe. Plaintiffs point out that the Tribe has been operating the casino — and presumably profiting from it— during the entire pendency of this suit (cf. Marcus v Village of Mamaroneck, 283 NY 325, 332 [1940] [noting in a zoning dispute that “the delay of plaintiffs has afforded defendants many years of unlawful use”]). While in Schulz the delay could have caused bond investors to lose the opportunity for investments were the bonds to be invalidated, here there is no comparable risk. True enough, had the casino been shut down on its grand opening, the investment would have been lost. But the casino has been operating for four years, and there is nothing on this record to indicate how much money the casino has made during the pendency of this action. Without knowing how much, if anything, the casino stands to lose — and having no basis to conclude that it has not profited — we cannot dismiss a suit on laches grounds for economic prejudice.
Plaintiffs argue that the Tribe was on notice as to the possible illegality of the compact, citing a memorandum from Governor Cuomo’s Counsel indicating that the Tribe had been informed that legislative approval would be required before the State could enter into effective compacts.[8] Thus, while the casino is presumably expected to make large sums over the *818 next several years, and while plaintiffs’ suit threatens that source of revenue, the prejudice caused by a loss of expected profits based on a predictably vulnerable compact is not the sort of prejudice that supports a defense of laches. Were it otherwise, very few suits would proceed past laches analysis, and certainly no suits seeking to invalidate illegal contracts could ever proceed.
There is another important distinction between Schulz and this case. In Schulz, the State approved a bond program to raise revenue. Investors bought bonds expecting the State to pay back the investment with interest. To maintain fiscal credibility as a borrower, the State must uphold its contracts, particularly when it has borrowed on credit. We recognized that entertaining a suit challenging the áuthority of the State to issue those bonds — particularly after a year’s delay — might hinder the State’s ability to raise financing in the future, to say *819 nothing of the effects on budget projections that invalidation of a source of revenue would cause (see Schulz, 81 NY2d at 347-348 [noting “the profound destabilizing and prejudicial effects from delay * * * (that) must be examined for their impact on the State, on the operation and maintenance of orderly government, on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general”]). None of those factors is present here.
VI. The Tribe as an Indispensable Party
The Tribe is not a party to this action. Although its interests are certainly affected by this litigation, the Tribe has chosen not to participate. Unless Congress provides otherwise, Indian tribes possess sovereign immunity against the judicial processes of states (see e.g. Santa Clara Pueblo v Martinez, 436 US 49, 58 [1978]; United States v United States Fid. & Guar. Co., 309 US 506, 512 [1940]; Turner v United States, 248 US 354, 358 [1919]). As a result, New York courts cannot force the Tribe to participate in this lawsuit. The State claims that the Tribe’s absence requires us to dismiss this action. We disagree.
CPLR 1001 sets forth the rules governing when joinder of parties is necessary to continue an action affecting the rights of those parties. The statute directs that persons must be brought into the action when joinder is necessary to accord “complete relief’ between the parties, or when the interests of the person might be “inequitably affected by a judgment in the action” (CPLR 1001 [a]). Where a person who should be joined nevertheless cannot be joined, courts must decide whether the action can proceed without the “necessary” party. Parties who must be joined lest the action be dismissed are termed “indispensable parties.” CPLR 1001 (b) provides five factors for courts to consider in deciding whether to dismiss an action where, as here, “jurisdiction over [the necessary party] can be obtained only by his consent or appearance”:
“1. Whether the plaintiff has another effective remedy in case the action is dismissed on account of the nonjoinder;
“2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined;
“3. whether and by whom prejudice might have been avoided or may in the future be avoided;
*820 “4. the feasibility of a protective provision by order of the court or in the judgment; and
“5. whether an effective judgment may be rendered in the absence of the person who is not joined” (CPLR 1001 [b]).
The State relies principally on paragraph (2), and argues that the prejudice to the Tribe caused by a judgment eviscerating the authority under which it operates the casino should be sufficient to dismiss the action. In contrast, plaintiffs rely on paragraph (1), arguing that there can be no remedy for the alleged constitutional violation if the Tribe’s absence requires dismissal.
Plaintiffs’ arguments are on firmer ground. Not only will these plaintiffs be stripped of a remedy if we hold that the Tribe is an indispensable party, but no member of the public will ever be able to bring this constitutional challenge. In effect, the Executive could sign agreements with any entity beyond the jurisdiction of the Court, free of constitutional interdiction. The Executive’s actions would thus be insulated from review, a prospect antithetical to our system of checks and balances.
There are two principal purposes of requiring dismissal owing to the absence of an indispensable party. First, mandatory joinder prevents multiple, inconsistent judgments relating to the same controversy. Second, joinder protects the otherwise absent parties who would be “embarrassed by judgments purporting to bind their rights or interests where they have had no opportunity to be heard” (First Natl. Bank v Shuler, 153 NY 163,170 [1897]; see generally, 3 Weinstein-Korn-Miller, NY Civ Prac 1001.01 [2002]).
Neither purpose applies here. The Tribe has chosen to be absent. Nobody has denied it the “opportunity to be heard”; in fact, the Oneida Indian Nation, which operates the Turning Stone Casino, has appeared as amicus curiae making much the same arguments we would expect to be made by the Tribe had it chosen to participate. While sovereign immunity prevents the Tribe from being forced to participate in New York court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe (see Keene v Chambers, 271 NY 326, 330 [1936]; Plaut v HGH Partnership, 59 AD2d 686 [1st Dept 1977]; 3 Weinstein-Korn-Miller, NY Civ Prac ][ 1001.10 [citing cases]). While we fully respect the sovereign prerogatives of the Indian tribes, we will not permit
*821 the Tribe’s voluntary absence to deprive these plaintiffs (and in turn any member of the public) of their day in court.
In balancing the CPLR 1001 factors, the Appellate Division concluded that the equities weighed against dismissal. That conclusion was not an abuse of discretion. While in other cases sovereign immunity might support dismissal,[9] here the factors weigh toward allowing judicial review of this constitutional question (see generally Siegel, NY Prac § 133 [“Dismissal of the action for nonjoinder of a given person is a possibility under the CPLR, but it is only a last resort”]).[10]
We conclude that the alleged constitutional violation will be without remedy if this action is dismissed for the Tribe’s nonjoinder. We further conclude that to the extent the Tribe is prejudiced by our adjudication of issues that affect its rights under the compact, the Tribe could have mitigated that prejudice by participating in the suit (cf. United States ex rel. Steele v Turn Key Gaming, Inc., 135 F3d 1249, 1252 [8th Cir 1998]). The Tribe’s nonjoinder is therefore excused, and we proceed to discuss the merits.
VII. Separation of Powers
Article III of the State Constitution vests the Senate and the Assembly with the legislative power of the State, while article IV vests the executive power in the Governor and article VI vests the court system with the judicial power (see NY Const, art III, § 1; art IV, § 1; art VI, § 1). We have recognized that these “separate grants of power to each of the coordinate branches of government” imply that each branch is to exercise power within a given sphere of authority (Clark v Cuomo, 66 NY2d 185, 189 [1985]). Stated succinctly, the separation of powers “requires that the Legislature make the critical policy *822 decisions, while the executive branch’s responsibility is to implement those policies” (Bourquin v Cuomo, 85 NY2d 781, 784 [1995] [citing Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340, 349 (1991)]).
This is not to say that the functions of government can be neatly boxed into judicial, executive and legislative categories. The distinctions are often elusive, and the fluid functioning of government requires that the interactions among the three branches be allowed some “play in its joints” (Bain Peanut Co. of Tex. v Pinson, 282 US 499, 501 [1931]; see also Youngstown Sheet & Tube Co. v Sawyer, 343 US 579, 635 [1952] [Jackson, J., concurring]; Matter of Richardson, 247 NY 401, 410 [1928]).
It thus falls to the courts, and ultimately to this Court, to determine whether a challenged gubernatorial action is “legislative” and therefore ultra vires. In this case we have no difficulty determining that the Governor’s actions were policy-making, and thus legislative in character.
Initially, we hold that IGRA does not preempt state law governing which state actors are competent to negotiate and agree to gaming compacts. IGRA imposes on “the State” an obligation to negotiate in good faith (25 USC § 2710 [d] [3] [a]), but identifies no particular state actor who shall negotiate the compacts; that question is left up to state law (see Pueblo of Santa Ana v Kelly, 104 F3d 1546, 1557 [10th Cir 1997], cert denied 522 US 807 [1997]). As the Supreme Court noted, the duty to negotiate imposed by IGRA “is not of the sort likely to be performed by an individual state executive officer or even a group of officers” (Seminole Tribe of Fla. v Florida, 517 US 44, 75 n 17 [1996] [citing State ex rel. Stephan v Finney, 251 Kan 559, 836 P2d 1169 (1992)]).
IGRA itself contemplates that states will confront several policy choices when negotiating gaming compacts (see Yavapai-Prescott Indian Tribe v Arizona, 796 F Supp 1292, 1296-1297 [D Ariz 1992]). Congress provided that potential conflicts may be resolved in the compact itself, explicitly noting the many policies affected by tribal gaming compacts. Indeed, gaming compacts are laden with policy choices, as Congress well recognized.
“Any Tribal-State compact negotiated under sub-paragraph (A) may include provisions relating to—
“(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State *823 that are directly related to, and necessary for, the licensing and regulation of such activity;
“(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
“(in) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
“(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
“(v) remedies for breach of contract;
“(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
“(vii) any other subjects that are directly related to the operation of gaming activities” (25 USC § 2710 [d] [3] [C]).
Compacts addressing these issues necessarily make fundamental policy choices that epitomize “legislative power.” Decisions involving licensing, taxation and criminal and civil jurisdiction require a balancing of differing interests, a task the multimember, representative Legislature is entrusted to perform under our constitutional structure.
Additionally, as noted by Governor’s Counsel in 1993, the compacts require the State Racing and Wagering Board to adopt new regulations for carrying out its casino oversight responsibilities. The choice of which agency shall regulate an activity can be as fundamental a policy decision as choosing the substance of those regulations. For that reason, and because agencies are creatures of the Legislature, the Constitution requires that agencies carry out only those duties assigned them by the Legislature expressly or by necessary implication (see Matter of Beer Garden v New York State Liq. Auth., 79 NY2d 266, 276 [1992]). There is no legislative authorization for state agencies to promulgate regulations for the oversight of casino gambling. The compacts therefore have usurped the Legislature’s power.
The State argues that by passing certain appropriation bills, the Legislature has signaled its approval of the compact. We disagree. Those enactments are no substitute for approval or *824 total ratification. The Legislature has been free to ratify the compact but, as yet, has not done so. Indeed, the State Assembly in a resolution expressly opposed the Governor’s unilateral action in negotiating and signing the compact. The resolution asked the Secretary of the Interior not to approve any compact unless approved by the Legislature. The Assembly stated that “[a]ny compact permitting casino gambling necessarily requires at a minimum the exercise of legislative power with respect to regulatory appropriations and related police powers,” and that therefore “[t]he Governor lacks authority to act on behalf of the State to enter into a tribal-state compact” (Assembly Resolution No. 2413 [1996]). This expression does not square with the State’s claim that the Legislature has impliedly approved the compact.
Unsurprisingly, every state high court to consider the issue has concluded that the state executive lacks the power unilaterally to negotiate and execute tribal gaming compacts under IGRA.[11] New Mexico, Kansas and Rhode Island have each concluded that gaming compacts incorporate policy choices reserved for the Legislature (see State ex rel. Clark v Johnson, 120 NM 562, 904 P2d 11 [1995]; State ex rel. Stephan v Finney, 251 Kan 559, 836 P2d 1169 [1992]; Narragansett Indian Tribe of R.I. v Rhode Island, 667 A2d 280 [RI 1995]; see also McCartney v Attorney Gen., 231 Mich App 722, 728, 587 NW2d 824, 827 [1998] [“(T)he Governor has the ability to enter into compacts with Indian tribes, subject to the approval of the Legislature”], appeal denied 460 Mich 873, 601 NW2d 101 [1999]). Today we join those states in a commitment to the separation of powers and constitutional government.
VIII. The Constitutional Antigambling Provision
The parties have argued the applicability of the State Constitution’s antigambling provision (NY Const, art I, § 9). In light of our disposition of the separation of powers question, it is unnecessary for us to reach that argument, and there are compelling reasons not to do so at this time. Indeed, anything we would say in that regard would be dictum, inasmuch as the separation of powers point is an independent ground for invalidating the compact.
*825 Neither the trial court nor the Appellate Division addressed the antigambling provision, and it is unwise for us — as a court of last resort — to initiate the discussion. Supreme Court did not discuss the article I, § 9 constitutional issue at all, and the Appellate Division made only a reference to it. Clearly, it is better for this Court not to resolve constitutional questions unaddressed by the lower courts (see Bernstein v Bodean, 53 NY2d 520, 529-530 [1981]; Comiskey v Arlen, 43 NY2d 696, 698 [1977]; see also Schiavone v City of New York, 92 NY2d 308, 317 [1998]).
Judge Read’s arguments in favor of the compact’s compatibility with article I, § 9, and the contrary views of Judge Smith, strengthen our belief that further development of the issue by the courts below is desirable, if not necessary. Judge Read and Judge Smith debate the applicability of Cabazon to the article I, § 9 issue. While their insights are illuminating, we note that the lower courts did not cite, let alone address, Cabazon or other possibly relevant cases. They did not determine whether the compact could survive an article I, § 9 challenge. The Appellate Division’s reference to the provision did not involve the treatment that should precede this Court’s review of an issue of that magnitude. The question of the compact’s compatibility with the Constitution’s antigambling provision is far too important for us to address in this legal vacuum. Furthermore, the parties have informed us that a case pending before the lower courts squarely addresses the question of the applicability of the State Constitution’s antigambling provision.
Accordingly, the order of the Appellate Division should be modified, with costs to plaintiffs, by vacating on the ground of mootness so much of the order as affirmed that portion of Supreme Court’s order declaring the May 27, 1999 amendment to the 1993 Tribal-State Compact void and unenforceable and, as so modified, affirmed.

. Plaintiffs additionally argue that allowing Las Vegas-style gaming violates the state constitutional prohibition against gambling (see NY Const, art I, § 9). For reasons that follow, we need not address that argument at this time.

. IGRA creates three classes of wagering games. Class I games are those “social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations” (25 USC § 2703 [6]). Class II gaming includes bingo and card games (excluding banking card games) that are operated in accordance with state law limits on the amount of wagers and hours of operation (see 25 USC § 2703 [7]). Class III gaming includes all other forms of gambling (see 25 USC § 2703 [8]).

. Deputy Counsel Judith Hard signed the amendment on behalf of the Governor.

. See 25 USC § 2710 (d) (1) (C) (authorizing casino gambling on reservations where there is a Tribal-State compact “that is in effect”); Seminole Tribe of Fla. v Florida, 517 US 44, 47 (1996).

. See e.g. Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772 (1991) (citing Schieffelin v Komfort, 212 NY 520, 530 [1914]; Doolittle v Supervisors of Broome County, 18 NY 155 [1858]); see also Wein v Comptroller of State of N.Y., 46 NY2d 394 (1979); Wein v Carey, 41 NY2d 498 (1977).

. In contrast to our approach, standing in federal courts rests on both constitutional (see US Const, art III, § 2 [1]) and prudential grounds. For a comprehensive treatment of standing in federal courts, see Erwin Chemerinsky, Federal Jurisdiction (at 56-114 [3d ed 1999]).

. See Krieger v Krieger, 25 NY2d 364 (1969); Calhoun v Millard, 121 NY 69 (1890); Guibord v Guibord, 2 AD2d 34, 36 (1st Dept 1956); 5 Weinstein-Kom-Miller, NY Civ Prac ([ 3001.19, at 30-152 — 30-153; Siegel, NY Prac § 36, at 45 (3d ed 1999) (citing Feldman v Metropolitan Life Ins. Co., 259 App Div 123 [1st Dept 1940]); id. § 438, at 711; 24C Carmody-Wait 2d, NY Prac § 147:129, at 140 (2001); Eager, The Declaratory Judgment Action § 9, at 41-44 (1971); Annotation, What Constitutes Laches Barring Right to Relief in Taxpayers’ Action, 71 ALR2d 529 (1960); Annotation, Statute of Limitations or Doctrine of Laches in Relation to Declaratory Actions, 151 ALR 1076 (1944); see also Town of Cortlandt v Village of Peekskill, 281 NY 490, 498 (1939) (denying a laches defense to a challenge of a village charter, citing intervening legislative action as excusing the delay in bringing suit); American Dock Co. v City of New York, 174 Misc 813 (1940), affd 261 App Div 1063 (1st Dept 1941), affd 286 NY 658 (1941).

. In pertinent part, the memorandum reads as follows:
“The compacts assign largely to one existing state agency — the Racing and Wagering Board — the state’s ‘regulatory and oversight’ power. The Board would (1) have access to all gaming facilities and business and accounting records; (2) receive daily inspection reports and patron complaints; (3) certify the Nation’s gaming employees; (4) register all enterprises that will provide gaming services, supplies and equipment to the Nation; (5) meet four times a *818 year with the Nation to discuss the regulatory and enforcement program; and (6) decide whether to allow new games or activities not included [sic] a compact. In order to carry out its new duties, the Board must adopt new rules and regulations.
“Only the Legislature, however, can direct the Board to undertake the new Indian gaming regulatory duties required by the compacts. Equine Practitioners Ass’n. Inc. v. New York State Racing and Wagering Board, 105 A.D.2d 215, 219 (1984), affd as modified on other grounds, 66 N.Y.2d 786 (1985) (‘An administrative agency, as a creature of the Legislature, is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication.’) And, only the Legislature can empower the Board to adopt the new rules and regulations that will be required in order for the Board to supervise Indian gaming. See, Beer Garden, Inc. v. New York State Liquor Authority, 79 N.Y.2d 266, 276 (1992) (a State agency’s rule-making authority must be granted to it by the Legislature).
“Nothing in existing law confers on the Board — expressly or by necessary implication — the authority to supervise Indian gaming, including the authority to adopt the new rules and regulations that will be required. * * *
“We have long recognized the need for legislative action to implement the compacts. The Governor has consistently taken the position that the Legislature would have to authorize the State to implement compacts that require the State to regulate and oversee Indian gaming. That is why the Governor submitted a program bill in 1990 and 1991, seeking authority from the Legislature to negotiate and enter into compacts with any Indian tribe or nation. And, that is why, from the outset of negotiations with the St. Regis Mohawk Tribe in 1990, and with the Nation last summer, the State’s negotiators told their Indian counterparts that legislative approval would be required before the State could enter into effective compacts. * * *
“The State cannot fulfill its regulatory responsibilities under the compacts without clear legislative authorization for the State agencies that must implement them. Absent such authorization, there is a substantial likelihood that the State’s regulatory authority would be challenged * * *” (emphasis added).

. We recognize that other courts have held that dismissal is proper when an affected tribe declines to waive sovereign immunity (see e.g. American Greyhound Racing, Inc. v Hull, 305 F3d 1015, 1025 [9th Cir 2002]; Dawavendewa v Salt Riv. Project Agric. Improvement & Power Dist., 276 F3d 1150, 1162 [9th Cir 2002]; Manybeads v United States, 209 F3d 1164, 1166 [9th Cir 2000]; Enterprise Mgt. Consultants, Inc. v United States ex rel. Hodel, 883 F2d 890, 894 [10th Cir 1989]). Our review of the CPLR 1001 factors, informed by New York’s policy disfavoring dismissal, convinces us that we should not follow those cases.

. For cases holding that an Indian tribe’s absence due to sovereign immunity should not result in dismissal, see e.g. Kansas v United States (249 F3d 1213 [10th Cir 2001]); Sac & Fox Nation of Mo. v Norton (240 F3d 1250 [10th Cir 2001]); Artichoke Joe’s v Norton (216 F Supp 2d 1084, 1090-1091 [ED Cal 2002]); Dairyland Greyhound Park, Inc. v McCallum (258 Wis 2d 210, 235, 655 NW2d 474, 487 [2002]).

. Mississippi allows its Governor the unilateral authority to negotiate and sign compacts (see Willis v Fordice, 850 F Supp 523 [SD Miss 1994], affd without op 55 F3d 633 [5th Cir 1995]). The Mississippi Constitution, however, vests residual powers with the Governor. By contrast, New York places residual policymaking responsibility with the Legislature.