OPINION OF THE COURT
Jane S. Solomon, J.
Introduction
This lawsuit addresses important issues central to the health of New York State’s government. Studies and newspaper editorials describe New York’s Legislature as “dysfunctional,” and as the worst state legislature in the country. (See Brennan Center for Justice, The New York State Legislative Process: An Evaluation and Blueprint for Reform [appended as exhibit A to the complaint]; Bring Democracy to State Legislature, New York Daily News, Aug. 8, 2004 [editorial]; Albany’s Failures, Press & Sun-Bulletin [Binghamton], July 20, 2004 [editorial].) Any New Yorker would find this commentary disheartening, as do I. Plaintiffs maintain that the internal rules by which the Assembly and Senate operate permit the Assembly Speaker and Senate Majority Leader too much discretion in managing legislation and allocating resources among the other legislators. Plaintiffs complain that the Speaker and Majority Leader wield the internal rules to bolster their political power and to stifle debate, all to the detriment of legislators in the minority parties and the state’s citizenry. Plaintiffs further complain that the Governor improperly puts his constitutionally granted ability to rush legislation under limited circumstances at the disposal of the Speaker and the Majority Leader, facilitating their aims at the expense of fair and open governance.
Changes to the rules of the Assembly and the Senate were sought last year, but few were enacted, leaving things substantially as they were. The plaintiff legislators, who are minority party members in each the Assembly and the Senate, now ask this court to help implement improvement in the way the Legislature and Governor do the State’s business. However, the judiciary’s power to intrude upon the internal affairs of the Legislature is limited, and consequently only three of plaintiffs’ 20 causes of action survive this order.
*942 This Motion
Defendants jointly move, pursuant to CPLR 3211 (a) (1) and (7), for an order dismissing the complaint. As a threshold matter, defendants contend that none of the plaintiffs has standing to raise any of the causes of action that are alleged in the complaint, and that the complaint as a whole must be dismissed because it raises a political question, and because all defendants have legislative immunity under both the common law and the Speech or Debate Clause, found in article III, § 11 of the State Constitution.
Seeking to end their “exclusion from the legislative process,” and to “keep open the political process” (plaintiffs’ mem of law at 9, 10), plaintiffs bring this declaratory judgment action in order to democratize the ways in which each house of the Legislature conducts its business. Plaintiffs seek to reduce certain benefits that the members of the majority party in each house enjoy, certain aspects of the control that the members of the majority party in each house exercise over the legislative process, and certain aspects of the control that the head of the majority party in each house exercises over the members of his party. In effect, the complaint alleges that, in each house, the majority has leveraged its numerical superiority so as to squelch debate among the members of the house, so as to place a stranglehold on proposed bills that are not favored by the leadership of the house, and more generally, so as to prevent members of the minority parties from effectively representing their constituents.
It is a matter of public knowledge that many bills, including those pertaining to the state budget, are decided by negotiations among defendants Bruno, Silver, and Pataki, and that, not infrequently, bills are put up for a vote without having previously been made available to legislators with sufficient time for them to read, let alone to think about and debate. (See, e.g., Brennan Center for Justice, supra.)
Plaintiff Urban Justice Center (the Center) is a nonpartisan, not-for-profit organization that represents poor and homeless New Yorkers, including youth in the City’s foster care system. Plaintiff Kirwan is a Republican member of the Democrat-controlled Assembly. Plaintiff Krueger is a Democrat member of the Republican-controlled Senate. Defendant Bruno is the Majority Leader of the Senate. Defendant Silver is the Speaker of the Assembly.
*943 The Complaint
The complaint contains 20 causes of action. The first three allege that the Majority Leader and the Speaker make more funds and resources (such as office space, computers, travel reimbursements and printing and mailing costs for newsletters) available to members of the majority party in their respective houses than to members of the minority party who have equal responsibilities. The complaint alleges that this practice violates plaintiffs’ rights to the equal protection of the laws (count I), the free speech, association, and debate provisions of the federal and state constitutions (count II), and the gifts and loans provisions of article VII, § 8 of the State Constitution (count III). Plaintiffs have withdrawn that branch of their second cause of action that alleged that funding for minority members’ newsletters was conditioned on content restrictions.
Counts IV through VII allege that the Majority Leader and the Speaker violate these same provisions, as well as article VII, § 7 of the State Constitution, which provides that no money shall be paid out of the state treasury except in pursuance of an appropriation by law, by allocating funds for member-initiated projects in their districts (member items) in light of the political needs of the majority party in each house so as to maintain control thereof. For example, a member of the majority party facing potentially strong opposition may get more such funds than a member of the minority party who is facing similar potential opposition.
Counts VIII and IX allege, respectively, that plaintiffs’ equal protection rights and their free speech rights are violated by Senate and Assembly rules that severely restrict the availability of motions to discharge a bill from committee for consideration by the full house.
Counts X through XIII allege that, in each house, the majority party meets in caucus and decides on that party’s position on a bill, without any public record being made of the debate, or of the party members’ votes. The position taken by the majority of the caucus is then supported by all members thereof, with the result that cross-party alliances in support of a bill that is not favored by the Majority Leader or the Speaker cannot be made. Plaintiffs allege that this practice violates their equal protection rights (count X), their rights to free speech, association, and debate (count XI), their constituents’ right to know what positions their representatives took and whether they participated in the debate (count XII), and the Open Meetings Law (Public Officers Law § 100 et seq.) (count XIII).
*944 Article III, § 14 of the State Constitution requires that a bill must be on the members’ desks at least three legislative days prior to its final passage, “unless the governor . . . shall have certified, under his or her hand and the seal of the state, the facts which in his or her opinion necessitate an immediate vote thereon.” Plaintiffs allege that the Governor abuses the availability of messages of necessity by overfrequent use, including the sending of such messages at the request of the Majority Leader or of the Speaker, that such abuse operates to the substantial disadvantage of members of the minority party because they do not have access to the final provisions of pending legislation until it is printed in final form, and that such abuse violates plaintiffs’ rights to equal protection (count XIV) and to free speech, association, and debate (count XV). Plaintiffs also allege that the Governor does not personally sign the messages of necessity, but that his counsel authorizes the use of an auto-pen (count XVI), and that such messages do not recite the relevant facts requiring an immediate vote, but rather recite boilerplate language (count XVII). Plaintiffs have withdrawn count XVII in light of Maybee v State of New York (4 NY3d 415 [2005]), in which the Court of Appeals held that article III, § 14 vests complete discretion in the Governor to determine what facts to include in a statement of necessity.
Finally, the complaint alleges that the provisions of Legislative Law § 5-a, which specify amounts to be paid, in addition to salary, to committee chairs and ranking minority members, disadvantage the minority because they enforce the leaders’ control over the majority members, and thus impair the ability of minority members to attract majority member support for legislation in the face of opposition from the Majority Leader or the Speaker. Plaintiffs allege that the provisions governing these payments, popularly known as “lulus,” violate their equal protection rights (count XVIII), their right to free speech, association, and debate (count XIX), and article III, § 6 of the State Constitution (count XX), which requires that all members of the Legislature be paid a “like” salary, except that:
“Any member, while serving as an officer of his or her house or in any other special capacity therein . . . may also be paid and receive, in addition, any allowance which may be fixed by law for the particular and additional services appertaining to . . . such office or special capacity.”
Plaintiffs allege that all members of the Senate and all but 46 *945 members of the Assembly hold a chairmanship, leadership or ranking minority position, and, therefore, receive lulus.
It is settled that, where the standing of plaintiffs is challenged, that issue must be decided at the outset. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801 [2003]; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761 [1991]; Matter of Dairylea Coop. v Walkley, 38 NY2d 6 [1975].) Inasmuch as none of the plaintiffs claims to have standing as a taxpayer (see Saratoga County Chamber of Commerce), plaintiffs must show that they have suffered a concrete injury. (Id.; Matter of Graziano v County of Albany, 3 NY3d 475 [2004].)
Standing of the Urban Justice Center
The Center, which was initially incorporated as the Legal Action Center for the Homeless, Inc., specifies its main activities as engaging in legal advocacy “on behalf of the homeless, indigent, disenfranchised, and those members of the general public who have been deprived of civil and economic rights,” and “[i]ncreas[ing] public awareness of civil and economic rights and the conditions and problems of the homeless, indigent, and disenfranchised.” (Jacoby affirmation, exhibit C, at 2.) The Center contends, in an entirely conclusory manner, that it has standing here because “defendants’ actions have caused it injury-in-fact by making it more difficult to achieve its institutional objectives within limited resources.” (Plaintiffs’ mem of law at 20.) In Mixon v Grinker (157 AD2d 423 [1st Dept 1990]), upon which plaintiffs rely, the Court held that the Coalition for the Homeless had standing to bring an action to require the State and New York City to provide medically appropriate housing to homeless persons infected with the human immunodeficiency virus. In that case, however, the Court found that the Coalition had been providing such housing at its own expense. Here, by contrast, the complaint is devoid of any factual allegation as to how the Center has been injured by the practices of which it complains.
Nor has the Center adduced a single fact to show that it has standing in a representative capacity. For an organization to have such standing, it must show that those whom it seeks to represent have themselves suffered an injury, and thus would have standing to sue individually. (See Society of Plastics Indus. v County of Suffolk, 77 NY2d 761 [1991], supra; Grant v Cuomo, 130 AD2d 154 [1st Dept 1987] [Coalition can represent abused children in action to require child protective services to comply *946 with requirement to commence investigation within 24 hours of report of abuse].) Here, the complaint is barren of any specific factual allegation that those on whose behalf the Center works suffer any concrete injury as a result of the practices that the Center seeks to challenge. While plaintiffs cite Williams v Rhodes (393 US 23 [1968]) for the proposition that an unreasonable limitation on the right to vote is a well-recognized injury-in-fact, they do not allege that those whom they seek to represent are not free to vote for such candidates as they wish. Nor do plaintiffs allege that any injury that those on whose behalf the Center acts may suffer, as a result of the practices challenged here, does not burden the public at large. That, in its role as counsel, the Center has represented persons who were unlikely to sue on their own, and who had suffered concrete injuries as the result of the practices that the Center was challenging on their behalf (see e.g. Betancourt v Giuliani, 325 F Supp 2d 330 [SD NY 2004] [representing homeless persons arrested for sleeping on park benches]; Brad H. v City of New York, 185 Misc 2d 420 [Sup Ct, NY County 2000], affd 276 AD2d 440 [1st Dept 2000] [representing mentally ill prisoners discharged from Rikers Island without discharge plans]), does not give it standing to appear as a party here.
Standing of the Legislator Plaintiffs
With regard to the first seven counts, Assemblyman Kirwan and Senator Krueger allege that they are being placed at a financial disadvantage with regard to both their legislative work and their political activity solely because, by virtue of their political affiliation, they are in the minority in their respective houses. As to those counts, these plaintiffs have plainly alleged that they have been injured in fact.
With regard to counts VIII through XI, XIII through XVI, and XVIII through XX of the complaint, the Assemblyman and the Senator have alleged no facts to show that either of them has been personally disadvantaged in a concrete way, on any specific occasion. They cannot possibly show, and therefore, they could not in good faith allege, that a particular bill that one or another of them favored, and that was not enacted, would have been enacted, or vice versa, absent the practices that they challenge here. However, these plaintiffs have alleged that those practices systematically and severely impede them in the performance of their legislative responsibilities, diminish their ability to represent their constituents, and make a mockery of their status as legislators.
*947 Prior to commencing this action, the Assemblyman and the Senator circulated a draft of their complaint in their respective houses. Defendants argue that, inasmuch as the Legislature responded by changing only some aspects of the applicable rules, plaintiffs are seeking to reverse a lost political battle in this court. However, the Assemblyman and the Senator are not attacking the validity of the rule changes, which they voted against. (Cf. Raines v Byrd, 521 US 811 [1997] [legislators lack standing to challenge validity of bills that they opposed].) Nor are they seeking to vindicate rights of their respective houses as a whole. (Cf. Silver v Pataki, 96 NY2d 532, 539 n 5 [2001].) With regard to the issue of standing, their claims are analogous to the claims of plaintiffs in Coleman v Miller (307 US 433 [1939]) and of the Speaker in Silver v Pataki. In both of those cases, plaintiffs were held to have standing because they alleged that their votes had been nullified by actions taken by officials in the executive branch. To be sure, unlike the plaintiffs in Coleman v Miller and Silver v Pataki, the Assemblyman and the Senator do not allege that a particular governmental outcome would have been different, but for the practices that they challenge, and, in contrast to the plaintiffs in Coleman and Silver, they complain, except in counts XIV through XVII, about actions taken by the majorities in their respective houses, rather than about actions taken by the executive branch. Still, like the plaintiffs in Coleman and Silver, plaintiffs are complaining that their legislative powers have been severely diminished by an improper exercise of power on the part of defendants.
The court recognizes that it is “fairly debatable” whether the injuries of which the Assemblyman and the Senator complain are “sufficiently personal and concrete to give them standing.” (Raines v Byrd, 521 US at 832 [Souter, J., concurring].) The Assemblyman’s and the Senator’s claims are not shared by the public as a whole, however, nor even by the Legislature as a whole, and they raise important constitutional issues, which, were both houses controlled by the same political party, would more clearly be seen as implicating core principles of representative democracy. On balance, therefore, the court concludes that the Assemblyman and the Senator have standing to raise counts VIII through XI, XIII through XVI, and XVIII through XX of the complaint. (See Saratoga Chamber of Commerce v Pataki, 100 NY2d at 814; Boryszewski v Brydges, 37 NY2d 361 [1975].)
As for count XII, the Assemblyman and the Senator represent their constituents in the Legislature, but they do not have *948 standing to represent them in an action at law. Contrary to plaintiffs’ argument, the relationship of an elected official to his or her constituents is not analogous to that between an organization and its members.
Immunity
The court now turns to the remaining threshold issues. Article III, § 11 of the State Constitution provides that “[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place.” This “Speech or Debate Clause” “serves to preserve the integrity of the Legislature by preventing other branches of government from interfering with legislators in the performance of their duties.” (People v Ohrenstein, 77 NY2d 38, 54 [1990].) The United States Supreme Court has held that the similar clause in the United States Constitution (art I, § 6) immunizes legislators for legislative acts, that is, acts that are an integral part of the legislative process. (77 NY2d at 53-54; see Hutchinson v Proxmire, 443 US 111 [1979]; Gravel v United States, 408 US 606 [1972].) Thus a legislator’s statements on the floor, or in a legislative committee, even if the latter is held outside the Legislature, are immunized. (See Oates v Marino, 106 AD2d 289 [1st Dept 1984].) So, too, are legislative acts, such as participating in a majority or a minority conference, and changing one’s seat to the other party’s side. (Matter of Rivera v Espada, 98 NY2d 422 [2002].) Accordingly, defendant legislators may not be held to account for the participation of the majority members of each house in their own caucus, and the decisions of a majority of those members that votes taken in the caucuses be secret, and that all members of the caucuses will be bound by the majority vote in each of those caucuses.
Similarly, inasmuch as the rules governing motions to discharge were adopted in the course of proceedings in each house, those rules are the outcome of “speech or debate,” and defendant legislators cannot be he held to account for them here. So, too, while Legislative Law § 5-a, like any other statute, may be challenged on constitutional grounds, the Majority Leader and the Speaker are not proper defendants in such a challenge. Counts XIV and XV appear to refer to paragraphs 38-40 of the complaint, in which plaintiffs allege that the Majority Leader and the Speaker frequently request that the Governor provide a message of necessity. Plaintiffs appear to have withdrawn these counts. (See plaintiffs’ mem of law at 31 [message of necessity *949 claim raised only against Governor].) In any event, requests for messages of necessity, by either the Majority Leader or the Speaker, are clearly legislative in nature, and defendant legislators are therefore immune from challenge on that score. Further, as discussed more fully below, the Governor has common-law legislative immunity with regard to his alleged excessive use of messages of necessity.
However, the Speech or Debate Clause does not immunize “ ‘acts which a legislator performs to secure support in the community . . . such as giving speeches in the community [and] issuing newsletters and press releases.’ ” (Matter of Rivera v Espada, 98 NY2d at 428, quoting People v Ohrenstein, 77 NY2d at 54; see also Matter of Straniere v Silver, 218 AD2d 80 [3d Dept 1996], affd 89 NY2d 825 [1996].) While the precise question here is one of first impression, it appears to this court that the allocations of funds among legislators for the performance of activities that do not come under the protection of the Speech or Debate Clause, such as the provision of member items, and the printing and mailing of newsletters, are also not protected, although such allocations are performed in the Legislature. In addition, the allocation of funds for office staff, computers, and office supplies is not protected by the Speech or Debate Clause, even though such funds are used in connection with legislative tasks. Such allocations, like the assignment of office space, are administrative in character, and are only tenuously related to acts that have heretofore been considered legislative. (See Supreme Court of Va. v Consumers Union of United States, Inc., 446 US 719, 736 [1980] [while Virginia court’s promulgation of code was legislative, and therefore immunized, declaratory and injunctive relief were proper in connection with court’s power to enforce code].)
Count XVI (Governor’s use of auto-pen) also is not barred by legislative immunity. Like other state officials and employees, the Governor may assert the protection of the Speech or Debate Clause on behalf of legislators, to the extent that he provides messages of necessity at the request of the Majority Leader or the Speaker. (Campaign for Fiscal Equity v State of New York, 179 Misc 2d 907 [Sup Ct, NY County 1999], affd 265 AD2d 277 [1st Dept 1999].) He may also assert a common-law legislative immunity on his own behalf, when performing a legislative task. (Id.; Bogan v Scott-Harris, 523 US 44 [1998].) Without question, signing and transmitting a message of necessity are legislative acts, inasmuch as they are permissible steps in the legisla *950 tive process (see id. at 55), and the Governor could not be sued for signing such a message in relation to one bill, and not in relation to another. However, choosing to delegate to his counsel the authority to sign, and choosing to have his signature affixed by the use of an auto-pen, are not legislative acts. The Governor has no discretion as to the manner of his signing. Article III, § 14 of the State Constitution requires the Governor to certify the factual basis for the need for an immediate vote “under his or her hand and the seal of the state.” Accordingly, the Governor is not immune in relation to that issue.
Finally, for purposes of this section of the discussion, the court declines plaintiffs’ invitation to hold that, unlike defendants Bruno and Silver, defendants Assembly and Senate are not protected by the Speech or Debate Clause. While that clause refers to “members,” the Assembly and the Senate can act only through their members. Accordingly, those defendants are immune, under the Speech or Debate Clause, to the same extent as the Majority Leader and the Speaker. (See Ohrenstein, 77 NY2d at 54 [“integrity of the Legislature”]; Warden v Pataki, 35 F Supp 2d 354, 358 [SD NY 1999], affd sub nom. Chan v Pataki, 201 F3d 430 [2d Cir 1999] [“bars actions against legislators . . . and, a fortiori, legislatures”].) However, the Assembly and the Senate are not shielded by common-law legislative immunity. (Campaign for Fiscal Equity v State of New York, 179 Misc 2d at 914; but see Supreme Court of Va. v Consumers Union of United States, Inc., 446 US at 733-734 [little doubt that had Virginia Legislature enacted challenged code, “legislature, its committees, (and) members” would have been immune] [dictum].)
Political Question
The political question doctrine is an expression of the constitutional separation of governmental powers among the legislative, executive, and judicial branches. Pursuant to that doctrine, the courts will, generally, adjudicate disputes concerning the allocation of power between the executive branch and the Legislature (see e.g. Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801 [2003]; Silver v Pataki, 96 NY2d 532 [2001]; Matter of King v Cuomo, 81 NY2d 247 [1993]). However, they are reluctant to intervene in intra-branch disputes. “It is a fundamental principle of the organic law that each [branch of state government] should be free from interference, in the discharge of its peculiar duties, by either of the others.” (Saxton v *951 Carey, 44 NY2d 545, 549 [1978].) Thus, for example, in Matter of Gottlieb v Duryea (38 AD2d 634 [3d Dept 1971], affd 30 NY2d 807 [1972], cert denied 409 US 1008 [1972]), the Court held that then-Speaker Duryea could not be sued for having refused to allow the mailing of an Assembly member’s letter to constituents, on the ground that the letter was too political. That grievance, the Court held, was “an internal matter to be handled within the procedures of the Legislature.” (Id. at 635.) The Court noted, however, that the case before it did not raise “an overriding constitutional issue.” (Id.)
As the Court of Appeals noted in Jones v Beame (45 NY2d 402, 408 [1978]), the line separating political, and therefore nonjusticiable issues, from justiciable issues is subtle, and it has moved with the passage of time. At the oral argument on this motion, defendants acknowledged that whether an issue should be held to be nonjusticiable may depend on the degree of harm that plaintiffs allege. Here, the issue that is raised by the first seven counts is not that one member’s mailing to constituents was barred on one occasion, as in Gottlieb, or the constitutionality of a law directing that no legislative salaries be paid after the first day of the fiscal year, until legislative passage of the budget has occurred, as in Cohen v State of New York (94 NY2d 1 [1999]). Rather, plaintiffs claim that the practices of which they complain systematically diminish their ability to represent their constituents effectively. Communicating with constituents and offering them adequate services “are considered an inherent part of the job of an elected representative.” (People v Ohrenstein, 77 NY2d at 47.) Indeed, defendant Senate’s Guidelines On Use of Mailing Privileges By Senate Members recognizes that members of the Senate have both “legislative” and “representational” responsibilities. (Fernald affidavit, exhibit A, at 1.) To be sure, plaintiffs do not allege that they get no funding for support services or member items. But they do allege that the differences in funding are gross, unrelated to differences in need, and attributable solely to differences in party enrollment. While the question is a close one, the court concludes that counts I-VII are not barred by the political question doctrine.
Count XVI alleges that, by authorizing the use of an auto-pen to sign messages of necessity, the Governor violates a specific constitutional standard. Such claims are justiciable. (Matter of Schulz v Silver, 212 AD2d 293 [3d Dept 1995].)
*952 Equal Protection
The court turns now to defendants’ CPLR 3211 (a) (7) motion, as addressed to counts I-VII and XVI. With regard to plaintiffs’ equal protection claims (counts I and IV), plaintiffs have not contended that they are members of a class whose claims demand heightened scrutiny by the court, and defendants argue that plaintiffs have failed to show that any fundamental right has been infringed. Even accepting for purposes of deciding this motion that no fundamental right is at stake, counts I and IV state a cause of action, inasmuch as there is a question of whether the alleged differences in funding for support services and member items are rationally related to a legitimate governmental interest. Notably, the allocation of these resources is not the product of a legislative enactment, which would enjoy a strong presumption of constitutionality. (LaValle v Hayden, 98 NY2d 155, 161 [2002].) Instead, the allocation allegedly is made by defendants Bruno and Silver in the exercise of their own discretion in furtherance of their political interests.*
Plaintiffs have alleged no facts to support their claims that their right to free speech is being abridged (counts II and V). At most, plaintiffs allege that funds for support services and for member items, overall, are unequally distributed to like members of the minority and the majority parties in each house. They do not allege any unequal distribution with specific regard to expressive activities.
Plaintiffs’ third and sixth counts fail to state a cause of action, because plaintiffs do not allege that any of the funds at issue are not being paid for valid governmental purposes. (See Matter of Schulz v State of New York, 86 NY2d 225 [1995].) They only claim that defendants Bruno and Silver are distributing those funds unequally, and with the purpose of maintaining control of their respective houses.
Plaintiffs’ seventh count alleges that the funds for member items are drawn from lump-sum appropriations, without “an agreement between the legislative branch and the executive branch as to how the monies will be spent.” (Complaint at 19.) That count fails because the “degree of itemization necessary in a particular budget is whatever degree of itemization is necessary for the Legislature to effectively review that budget . . . *953 [and] is a decision which is best left to the Legislature.” (Saxton v Carey, 44 NY2d at 550.)
Auto-Pen Certification of Messages of Necessity
Finally, defendants argue that count XVI should be dismissed because the requirement in article III, § 14, that a message of necessity be “certified, under his or her hand,” does not specify the means whereby the Governor must make the signature, and because General Construction Law § 46 defines “signature” to include “any . . . mark or sign, written, printed, stamped, photographed, engraved, or otherwise placed upon any instrument or writing with intent to execute or authenticate such instrument or writing.” Defendants’ argument is valiant, but it ignores the inconvenient fact that article III, § 14 requires certification “under [the Governor’s] hand,” not the Governor’s “signature.”
Conclusion
To summarize, in addition to count XVI, discussed immediately above, counts I and IV by the Assemblyman and Senator, complaining of an unequal allocation of resources in violation of the equal protection provisions of the federal and state constitutions, survive the motion.
Accordingly, it hereby is ordered that the motion to dismiss is granted to the extent that the second, third, fifth through fifteenth, and seventeenth through twentieth causes of action are dismissed.

 The court notes, however, that plaintiffs’ allegations concerning unequal funding for mailings appear to be contradicted by the applicable rules of the Senate (see Fernald affidavit, exhibit A, at 1), and by the Speaker’s communications directive. (See Longo affidavit, exhibit A, at 3.)