[752 NYS2d 19]

AYA AZRIELANT, Appellant-Respondent, v OFER AZRIELANT, Respondent, and ANDIN INTERNATIONAL INC., Respondent-Appellant.

First Department, December 10, 2002

APPEARANCES OF COUNSEL

*Robert A. Weiner* of counsel, New York City (*Elliot Silverman, Jacob W. Heller* and *Alan A. Heller* on the brief; *McDermott, Will & Emery* and *Heller, Horowitz & Feit, P.C.,* attorneys), for appellant-respondent.

*Amnon Shiboleth* of counsel, New York City (*Shiboleth, Yisraeli, Roberts & Zisman, LLP,* attorneys), for Ofer Azielant, respondent.

*John M. O'Connor* of counsel, New York City (*Stanley A. Bowker* and *Mark Weldon* on the brief; *Anderson Kill & Olick, P.C.,* attorneys), for Andin International Inc., respondent-appellant.

## OPINION OF THE COURT

ELLERIN, J.

At issue before us is the correctness of a court's vacatur of an arbitration award on the ground that, by imposing punitive damages for breach of certain of its terms, the award violates the public policy of this State, which reserves to itself the sanction of punitive damages. We hold that, to reach its conclusion that the award imposes punitive damages, the court engaged in an analysis of the award that exceeded the limits of judicial authority in the arbitration arena, and therefore reverse.

Petitioner Aya Azrielant (Aya) and respondent Ofer Azrielant (Ofer), a married couple, are joint owners and the President and chief designer and Chairman and Chief Executive Officer, respectively, of respondent Andin International Inc. (Andin), a highly successful jewelry business, which they founded in 1981. In March 1997, unable to resolve their increasing personal and business differences, Aya and Ofer executed the following arbitration agreement:

> "WHEREAS: The Parties are married; and
>
> "WHEREAS: The Parties have many and varied common business interests, including joint ownership and/or common ownership in various companies; and
>
> "WHEREAS: The Parties desire to define, allocate and/or otherwise separate and distinguish their common and/or joint interests among and between themselves; and * * *
>
> "Therefor[e], the Parties hereby agree to the following:

"1. The Preamble to this Agreement is an integral part thereof.

"2. The Parties hereby agree to appoint Mr. Issack Westman, Adv., of Tel-Aviv, Israel, as the Sole Arbitrator (hereinafter: 'the Arbitrator').

"3. The Arbitrator shall not be subject to substantive law, neither Rules of Evidence or Rules of Procedure, nor to any other law or rules, including the rules of the American Arbitration Association.

"4. The Arbitrator shall not be required to maintain a protocol of the proceedings nor shall he be required to provide the basis to his decision or decisions. [A handwritten sentence inserted here, only partially legible, but apparently initialed by the parties, authorizes the arbitrator to conduct meetings with Aya and Ofer either together or separately, at his discretion.] * * *

"6. The Arbitrator shall have sole discretion and shall not be limited in issuing his Decision or Decisions, such that he may rule as he sees fit, and shall in addition have the power to order all or any of the following remedies:

"a. Compensation Payments.

"b. Assessment and Division of Assets.

"c. Sale by either Party to the other Party or any body or other entity of all that Party's share and/or rights and/or entitlements in any Company at a price to be determined by the Arbitrator. * * *

"7. Judgement rendered by the Arbitrator shall be final, binding on the Parties, not subject to appeal, and may be entered in any court having jurisdiction thereof."

The parties then convened with their appointed arbitrator, Issack Westman, to establish the procedures for conducting the arbitration. Westman's summary of the meetings states, in pertinent part, that each of the parties "may demand the liquidation of the partnership to the rights at any stage of the arbitration," that the "rights of the parties to the capital portion of the parties shall be equal, notwithstanding [Ofer's managerial priority by virtue of his possessing 75% of the voting shares, which] shall not involve any financial advantages in

the framework of the relations between the parties," that the parties "shall maintain the present situation (status quo) and shall not engage in any activities, directly or indirectly, aiming at changing or harming the position of any of the parties," and that both parties "have agreed in principle on liquidation of the partnership or division of the assets as submitted at the request of each of the parties."

In 1999, Aya and Ofer signed another agreement, which re-affirmed the arbitration agreement and the arbitrator's authority to divide their jointly owned assets equally. This agreement declared, in pertinent part:

> "The Parties agree[ ] that the party acquiring any particular asset (or the other Party's share there-[of]) shall be obligated, within the scope of the acquisition, to release the other party from all and any commitments and/or guarantees assumed by that Party with regard to said asset."

On April 8, 2000, Ofer asked Westman to "start immediately procedures for separation of assets" and, on April 11, to "[p]lease activate the Tri[g]ger." Aya and Ofer began to discuss the terms under which Ofer could acquire Aya's shares of Andin and otherwise divide their joint assets. At the time that the arbitration agreement was executed, Andin was a signatory to various loan agreements with NatWest Bank, N.A., and Fleet Bank, N.A., and had entered into a loan agreement with Foothill Capital Corporation for up to $50 million, of which Aya had signed a personal guarantee that was scheduled to expire in early 2001. Aya proposed, in accordance with the 1999 agreement, that, as a condition of Ofer's purchase of her stock, she be released from the bank guarantee.

Meanwhile, Ofer became interested in Andin's acquiring I. Kurgan & Co., Inc., a competitor in the jewelry business, and, to that end, he desired to enter into new long-term loan transactions with Fleet National Bank, N.A., and the New York branch of ABN AMRO Bank, N.V. These arrangements would require Aya to personally guarantee a line of credit of up to $90 million to replace the existing line of credit. Aya refused to agree to the acquisition and to assume any new guarantee absent an agreement between her and Ofer or, alternatively, a ruling from the arbitrator, dividing their assets. Subsequently, Ofer submitted a proposal pursuant to which, inter alia, Aya would receive the couple's apartment, its contents and art collection, valued at some $3 million, and she

could sell her entire ownership interest in Andin, or 60% thereof; if she chose to sell her entire ownership interest, she would receive $16 million, with an initial payment of $1.5 million in February of 2001 and a second payment of $14.5 million on a future mutually agreed upon date, plus interest at a rate to be determined by the arbitrator between 1% and 1.75% above the basic prime rate. This proposal was conditioned upon Aya's approval of the Kurgan acquisition and her execution of new personal bank guarantees to replace the expiring ones. In addition, Ofer and Aya signed a document requesting "the arbitrator to make a decision in this matter and determine that whoever commits a breach of this agreement will pay all the expenses and bear the consequences according to the decision of the arbitrator."

Westman rendered a decision on August 12, 2000, at Ofer's request, binding Ofer to his proposal, giving Aya, with Ofer's consent, two days to either accept or reject it, and, at the request of both, granting these "obligations * * * the status of a binding decision." Upon Aya's timely notification that she accepted Ofer's proposal, Ofer transferred his rights to the apartment and its contents to her, in September of 2000, and she executed consents permitting Andin to acquire Kurgan and to enter into new banking relationships, and executed guarantees that increased her personal exposure from $50 million to $90 million.

By letter and e-mail dated December 20, 2000, Westman sent Aya and Ofer what he called the "principles regarding the purchase of Aya's shares by Ofer," concerning which "the parties have reached a mutual consent," and a list of matters still unresolved. In his e-mail Westman asked Aya and Ofer to "confirm receiving the attached" document containing these "principles." Ofer responded by e-mail, with a copy to Aya, on December 29, 2000, expressing certain objections and concerns but essentially agreeing to the terms that would ultimately comprise the award. In particular, with respect to Westman's statement that Ofer would make the first payment for Aya's shares in Andin by February 1, 2001 and the second payment by February 1, 2002, Ofer responded that the date of the first payment should be February 28, 2001 and the date of the second February 28, 2002. With respect to Westman's statement that "[t]he Arbitrator shall decide, at its sole discretion, on the damages and compensation in the event of infringement by any of the parties [of] his obligations pursuant [to] the provisions of the transaction," Ofer responded, "agreed."

However, on January 26, 2001, notwithstanding that Aya had already agreed to the Kurgan acquisition and had affixed her signature to new personal guarantees, Ofer announced that the arbitration proceeding was invalid and that he would no longer take part. Aya's counsel responded by asking Westman to issue an award. Westman informed Ofer's attorney that he would do so shortly unless Ofer commenced judicial proceedings challenging his authority. No such proceedings were instituted, and Westman rendered an award on February 27, 2001.

In the award, Westman set forth Ofer's obligation to make the initial payment to Aya by February 28, 2001, and the second payment by February 28, 2002, thus adopting Ofer's proposed dates, and also set forth Ofer's obligation to obtain the certificate of release for Aya from her personal guarantee by February 28, 2002. Westman defined these terms, as well as certain others, as "fundamental" sections of the award. He then set forth the consequences of a fundamental breach:

> "The compensation upon Fundamental Breach by the buyer (Ofer) of his obligations according to the provisions of the Assets Agreement is set to be an amount of US$1,750,000, and the seller (Aya) will have the right to buy the buyer's shares, at a price of 15% less than the price of the shares as stated in this Assets Agreement (US$16,000,000.00 or US$9,600,000.00, as applicable); and

> "If the seller does not wish to buy the buyer's shares, then the Company will be sold at the best price obtainable, and the proceedings of the sale shall be divided as follows: buyer (Ofer)—45%, seller (Aya)—55%, and on 30% basis, proportionally."

On February 28, 2001, the date on which the initial payment was due, Ofer informed Aya that he had no intention of complying with any of the terms of the award and that he would not make the $1.5 million payment. Aya commenced this proceeding to confirm the award (naming Andin as one of the respondents on the ground that the award directed the transfer to Aya of certain property owned by the company). Respondents cross-moved to vacate the award.

The IAS court vacated the award on the ground that Ofer's obligations to obtain the certificate of release for Aya from her personal guarantee and to make the first payment to Aya by

February 28, 2001, or face the "onerous" consequences of a fundamental breach, are "punitive in nature" and thereby violate the public policy of this state (*see Garrity v Lyle Stuart, Inc.*, 40 NY2d 354). The court found that the first obligation requires Ofer "to perform a task not in his power to do," in that only the bank can release Aya from her personal guarantee, and the second requires him to make a $1.5 million payment on one day's notice. "It is one thing to provide for penalties for failure of a party to comply with a condition," the court observed. "And the penalties may even be severe. That in itself would and should not lead to a vacatur of an award. However, here where it is virtually impossible for a party not to breach with the attendant result of onerous penalties, that does lead to a vacatur." We conclude, to the contrary, that the award should have been confirmed and therefore reverse.

Judicial authority to vacate an arbitration award is limited. Unless the arbitration agreement provides otherwise, an arbitrator is not bound by principles of substantive law or by rules of evidence but "may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be" and his award will not be vacated "unless it is violative of a strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on his power" (*Matter of Silverman [Benmor Coats]*, 61 NY2d 299, 308). A court is bound by an arbitrator's factual findings, interpretation of the contract and judgment concerning remedies, and "cannot examine the merits of an arbitration award and substitute its judgment for that of the arbitrator simply because it believes its interpretation would be the better one" (*Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York*, 94 NY2d 321, 326). Even where an arbitrator makes errors of law or fact, a court may not undertake to conform the award "to [its] sense of justice" (*id.*). An arbitrator's award will be confirmed "if any plausible basis exists for the award" (*Graniteville Co. v First Natl. Trading Co.*, 179 AD2d 467, 469, *lv denied* 79 NY2d 759, citing *Matter of Silverman, supra*).

Consistent with the public policy in favor of arbitration, the grounds for vacating an arbitrator's award as set forth in CPLR 7511 (b) "are few in number and are narrowly applied" (Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7511:2, at 772). Only if a party's rights were prejudiced by corruption, fraud or misconduct (CPLR 7511 [b] [1] [i]), bias (cl [ii]), excess of power (cl [iii]) or procedural defects (cl [iv]) should an award be vacated. For the same rea-

son, the invocation of public policy concerns to justify a court's usurping the role of an arbitrator and determining a dispute on the merits is also limited (*Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York*, 94 NY2d 321, 326). With respect to the public policy against the sanction of punitive damages as a purely private remedy (*see Garrity, supra*), the Court of Appeals has instructed that "[o]nly where the damages are genuinely intended to be punitive should the courts vacate the award" (*Board of Educ. of Cent. School Dist. No. 1 of Towns of Niagara, Wheatfield, Lewiston & Cambria v Niagara-Wheatfield Teachers Assn.*, 46 NY2d 553, 558).

With these principles in mind, we are compelled to the conclusion that the arbitration award before us does not fall within the proscribed sanction. The parties worked with the arbitrator for nearly four years to realize their "desire to define, allocate and/or otherwise separate and distinguish their common and/or joint interests among and between themselves," as their initial agreement states, negotiating and ultimately agreeing beforehand to every material provision of the award. The IAS court rejected respondents' arguments that Westman was motivated by corruption, fraud or misconduct or bias. Indeed, the court observed that Westman's conduct toward Aya and Ofer was friendly and informal and consistent with his longstanding status as advisor, confidant and friend to them. The court also rejected respondents' argument that the award was not final and definite, pursuant to CPLR 7511 (b) (1) (iii). And the court made clear that it tried hard to justify confirming the award, in light of the strong policy favoring arbitration, the broad authority freely given the arbitrator by the parties, and "all of the efforts gone into the negotiations leading up to the preparation of the Award." In the end, however, the court held, pursuant to clause (iii), that the arbitrator exceeded his power by imposing on Ofer onerous penalties for his failure to discharge obligations that he was incapable of discharging.

As the court recognized, even severe penalties are distinct from punitive damages. There is no suggestion here that the damages set forth in the award are intended as a punitive measure (*cf. Weidman v Fuchsberg*, 177 AD2d 342, 345, *lv denied* 79 NY2d 758 [damages for "bad faith termination" unjustifiedly declared indistinguishable from punitive damages]). Westman described them as compensation to Aya for a breach by Ofer of a fundamental obligation. They serve as an enforcement mechanism. Therefore, the crux of the matter is the

court's determination that compliance with his obligations was not within Ofer's power, albeit that he agreed to these terms. Ofer committed himself, without qualification, to release Aya, by February 2002, from her then existing personal guarantee in exchange for her agreement to the purchase of Kurgan and her execution of a new personal guarantee on a larger line of credit required for that acquisition. Both Aya and Ofer had agreed that the party acquiring any particular asset would be obligated to release the other party from any guarantees assumed by that party in connection with that asset. And, in July 2000, after Westman, at Ofer's request, had initiated the process of dividing the parties' assets, Ofer responded to a proposal of Aya's by agreeing specifically to obtain the "[b]ank release by 2/1/2002 as in [her item no.] 10." Ofer also committed himself to making the initial payment to Aya for her shares in Andin by February 28, 2001.

The IAS court rejected the argument that Ofer's agreement binds him to comply with these terms on the ground that compliance is not in his power. However, the finding that Ofer is unable to discharge these obligations derives from impermissible "second-guessing" of factual or legal determinations of the arbitrator (*Hackett v Milbank, Tweed, Hadley & McCloy*, 86 NY2d 146, 155). Westman worked closely with Aya and Ofer throughout the lengthy negotiations leading to the making of the award, as the court noted. His judgment of Aya's and Ofer's expectations, preparedness and capabilities at the time that he issued his award is beyond judicial review, as is his judgment as to the appropriate penalty for Ofer's breach of a fundamental term of the award (*see Correctional Assn., supra*, 94 NY2d at 327 [courts are not authorized to revisit an arbitrator's assessment of the evidence, interpretation of the contract or reasoning in fashioning the award]). Upon examination of the award, in that context, we are unable to conclude that public policy precludes its enforcement (*Hackett v Milbank, supra*, 86 NY2d at 155).

Accordingly, the order and judgment (one paper), Supreme Court, New York County (Alice Schlesinger, J.), entered January 14, 2002, which denied petitioner's motion to confirm an arbitration award and granted respondents' cross motion to vacate the award, should be reversed, on the law, with costs, petitioner's motion granted, respondents' cross motion denied and the arbitration award confirmed.

Motion seeking injunction and for other related relief denied as academic.

NARDELLI, J.P., MAZZARELLI, SULLIVAN and RUBIN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered January 14, 2002, reversed, on the law, with costs, petitioner's motion to confirm an arbitration award granted, and respondents' cross motion to vacate the award denied. Motion seeking injunction and for other related relief denied as academic.