368

■ In the Matter of BROWN & WILLIAMSON TOBACCO CORPORATION et al., Respondents, v STANLEY M. CHESLEY et al., Appellants, et al., Respondent. [777 NYS2d 82]—

Order, Supreme Court, New York County (Nicholas Figueroa, J.), entered October 2, 2002, which granted the petition to vacate an arbitration award pursuant to CPLR 7511 (b) (1) (iii), unanimously reversed, on the law and the facts, without costs, the petition denied and the award reinstated.

Respondents-appellants are members of the "Castano Group," a group of more than 50 law firms nationwide formed over a decade ago to bring lawsuits against the tobacco industry. In 1994, the Castano Group filed its first lawsuit in federal District Court in Louisiana. Although the class was initially certified, an appellate court decertified the class. Consequently, the Castano Group filed 25 state class actions nationwide and appellants (hereinafter Ellis Counsel) commenced the Ellis Action, which gives rise to this appeal. The Ellis Action[1] was one of several private attorney general suits filed in California by private law firms, which were eventually consolidated.[2]

In the meantime, the tobacco companies attempted to settle the numerous pending nationwide lawsuits. The first attempt at settlement was to enter into an accord, known as the June 20, 1997 Proposal, which required legislative and executive action. This Proposal never became law, but it did contribute to an eventual settlement. After the Proposal was abandoned, the various Attorneys General and private counsel began negotiating a nationwide settlement agreement. Eventually, petitioners Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, R.J. Reynolds, and nonparty Philip Morris Incorporated (the participating tobacco companies), entered into a

---

1. The Ellis Action was commenced in July 1996 and named for a private citizen of California. The action was voluntarily dismissed and refiled in December 1996. Thereafter, California's then Lieutenant Governor Gray Davis joined the action as a named plaintiff in his capacity as a private citizen, and the action became known as the Davis/Ellis Action.

2. California law permits parties to bring private attorney general actions in the State of California.

global Master Settlement Agreement (MSA)[3] with 46 states, the District of Columbia, and certain territories in November 1998 to settle the outstanding lawsuits throughout the country. The participating tobacco companies agreed, among other things, to pay approximately $206 billion[4] to the settling states nationwide over 25 years. Pursuant to the terms of the MSA, the State of California is to receive in excess of $25 billion over the course of 25 years. Over and above the settlement proceeds, the participating tobacco companies agreed to pay reasonable attorneys' fees to private counsel on a state-by-state basis. The terms of the fee payments are set forth in a Model Fee Payment Agreement included in the MSA. The Davis/Ellis Action was not settled as part of the MSA.

On December 9, 1998, the participating tobacco companies and Ellis Counsel entered into an arbitration agreement in which the parties agreed that counsel was entitled to enter into a fee agreement in the Davis/Ellis Action, which was substantially the same as the Model Fee Payment Agreement. The parties thereafter entered into the Ellis Fee Payment Agreement (hereinafter the Fee Agreement), dated September 29, 2000, which superseded the arbitration agreement and contained the complete statement of the parties' fee agreement.

Section 2 of the Fee Agreement, which lies at the heart of this appeal, states that: "The Original Participating Manufacturers will pay reasonable attorneys' fees to Ellis Counsel for their representation of the plaintiffs in connection with the [Davis/Ellis] Action, as provided herein and subject to the Code of Professional Responsibility of the American Bar Association. Nothing herein shall be construed to require the Original Participating Manufacturers to pay any attorneys' fees other than a Fee Award,[5] as provided herein, nor shall anything herein require the Original Participating Manufacturers to pay any Fee Award in connection with any litigation other than the Action."

Also relevant to this appeal is section 10, which states, in pertinent part, the following: "The members of the Panel will

3. The Master Settlement Agreement is not included in the record on appeal.

4. Apparently, four states—Mississippi, Florida, Texas and Minnesota—had entered into prior settlements totaling approximately $40 billion.

5. The Fee Agreement defines Fee Award as "any award of attorneys' fees by the [Arbitration] Panel in connection with a Tobacco Case" (§ 1 [i]). The Fee Agreement defines Tobacco Case as "any tobacco and health case (other than a non-class action personal injury case brought directly by or on behalf of a single natural person or the survivor of such person or for wrongful death, and any non-class action consolidation of two or more such cases)" (§ 1 [q]).

consider all relevant information submitted to them in reaching a decision as to a Fee Award that fairly provides for full reasonable compensation of Ellis Counsel. In considering the amount of the Fee Award, the Panel shall not consider . . . any Fee Award that already has been or yet may be awarded in connection with any other Tobacco Case. The Panel shall not be limited to an hourly-rate or lodestar analysis in determining the amount of the Fee Award of Ellis Counsel, but shall take into account the totality of the circumstances . . . The Panel's decision as to the Fee Award of Ellis Counsel shall be final, binding, and non-appealable."

Pursuant to the Fee Agreement, Ellis Counsel made an application for a fee award before an arbitration panel (hereinafter the panel) convened pursuant to the Fee Agreement. As noted by the panel itself, the Ellis fee arbitration was the 18th arbitration held before the identical three-member panel to determine fee awards in connection with the settlement of various claims against the tobacco industry.[6]

Both sides made extensive submissions to the panel and participated in four days of hearings, resulting in a record of over 1,800 pages. The panel's majority awarded attorneys' fees in the amount of $1.25 billion in a one-paragraph decision, stating that opinions would follow. In September 2001, petitioners commenced the instant proceeding in Supreme Court, New York County,[7] to vacate the award, contending that the majority of the panel had exceeded its power by awarding fees for work done "in connection with" actions other than the Davis/Ellis Action. On July 12, 2002, the majority and the dissenting arbitrator issued their respective opinions.

The majority deemed the following to be "in connection with" the Davis/Ellis Action:

a. work directly performed within and as part of the Davis/Ellis Action;

b. national work product specifically available and to be used in the trial of the Davis/Ellis Action; and

c. national effort contemporaneous with the Davis/Ellis Action, which may reasonably have contributed to the disposition of the case.

---

**6.** The Ellis fee arbitration was also the third proceeding before the same panel in which private counsel did not represent a state attorney general, but instead brought actions as a private attorney general pursuant to California law.

**7.** Although the Fee Agreement is governed by California law, the arbitration took place in New York and petitioners commenced this proceeding in New York County. The parties agree that there is no substantive difference between California and New York law on the issue of arbitration review.

In determining the fee award the majority cited the risk, complexity, effort and achievement of Ellis Counsel, factors which the same panel had previously used in determining other tobacco fee awards. These factors will be discussed in greater detail, *infra*. The dissent found that the award "truly shocks the conscience"[8] and was based on "Ellis counsel's invitation to error: to award fees for years of work done in other cases." Based on the evidence, the dissent concluded that "there was only relatively minor work performed that was actually done in connection with the [Davis/Ellis] case." The dissent believed that the majority had "exceeded the express limitations of their authority" contained in the Fee Agreement.

The IAS court found that the majority had exceeded its power by awarding fees for nationwide litigation going back to 1993. The court reasoned: "The parties have solely agreed to have the arbitrators determine one thing—the narrow issue of Ellis Action fees payable to respondents, nothing more. In overstepping Section 2, the arbitrators undertook to resolve the unsubmitted issue of respondents' nationwide compensation. Their geographical scope, however, was limited by Section 2's narrow arbitration clause[;] therefore, by overstepping this limitation the arbitrators exceeded their power."

The court interpreted the language at issue in the Fee Agreement as meaning that the arbitrators were restricted to assessing compensation for work done "in connection with and directly impacting" the Davis/Ellis Action. The court further noted that one cannot tell from reading the majority opinion how the award was allocated. As a result, the court vacated the award as to all of the tobacco companies, including Philip Morris, even though Philip Morris had not joined in the petition to vacate the award, and remanded for a rehearing "consistent with the limitations imposed by Section 2" of the Fee Agreement.

We disagree and reverse. It is beyond cavil that the scope of judicial review of an arbitration proceeding is extremely limited (CPLR 7511 [b]; *Matter of United Fedn. of Teachers, Local 2, AFT, AFL-CIO v Board of Educ. of City School Dist. of City of N.Y.*, 1 NY3d 72 [2003]; *Matter of Silverman [Benmor Coats]*, 61 NY2d 299 [1984]; *Azrielant v Azrielant*, 301 AD2d 269 [2002], *lv denied* 99 NY2d 509 [2003]). Indeed, "Courts are reluctant to disturb the decisions of arbitrators lest the value of this method

---

8. An excessive award which shocks the conscience is not a ground to vacate an arbitration award (CPLR 7511 [b]), and, indeed, the participating tobacco companies themselves did not even see fit to make this an issue on appeal.

of resolving controversies be undermined" (*Matter of Goldfinger v Lisker*, 68 NY2d 225, 231 [1986]; *see also Matter of Kern v Krackow*, 309 AD2d 650 [2003], *lv denied* 1 NY3d 505 [2003] [judicial intervention would contravene strong public policy of this State in favor of resolution of disputes in arbitration as a means of conserving scarce judicial resources]). In addition, unless the agreement provides to the contrary, "an arbitrator is not bound by principles of substantive law or by rules of evidence but 'may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be' " (*Azrielant*, 301 AD2d at 275, quoting *Matter of Silverman*, 61 NY2d at 308). Accordingly, an award will not be vacated "unless it is violative of a strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on his power" (*Matter of Silverman*, 61 NY2d at 308; *accord Matter of United Fedn. of Teachers, supra*).

In reviewing an award, a court is bound by the arbitrator's factual findings and interpretations of the contract (*see Matter of New York State Correctional Officers & Police Benevolent Assn. v State of New York*, 94 NY2d 321 [1999]). Furthermore, a court "cannot examine the merits of an arbitration award and substitute its judgment for that of the arbitrator simply because it believes its interpretation would be the better one" (*Matter of New York State Correctional Officers & Police Benevolent Assn.*, 94 NY2d at 326). Moreover, "as long as arbitrators act within their jurisdiction, their awards will not be set aside because they have erred in judgment either upon the facts or the law" (*Goldfinger*, 68 NY2d at 230). In short, an arbitration award cannot be vacated if there exists any plausible basis for it (*Azrielant*, 301 AD2d at 275).

Consistent with the public policy favoring arbitration, the grounds for vacating an arbitration award are narrowly circumscribed by statute (*see* CPLR 7511 [b]). The participating tobacco companies argue that the arbitrators exceeded their power (CPLR 7511 [b] [1] [iii]) by not limiting the fee award to work solely done "in connection with" the Davis/Ellis Action as set forth in section 2 of the Fee Agreement. However, any limitation of an arbitrator's power must be "contained, explicitly or by reference, in the arbitration clause itself" (*Matter of Silverman*, 61 NY2d at 302).

The gravamen of the participating tobacco companies' plaint on this appeal boils down to a single issue: whether the language in section 2 of the Fee Agreement defines the power of the arbitrators to act or whether that section defines the scope, limits or meaning of the Fee Agreement itself. The initial ques-

tion of arbitrability is reserved to the judiciary while the ultimate disposition of the merits is reserved for the arbitrators (*Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co.*, 37 NY2d 91 [1975]; *Matter of Spanish Gardens Co. [Local 32B-32J, Serv. Empls. Intl. Union]*, 86 AD2d 815 [1982], *affd* 56 NY2d 826 [1982]). In analyzing this question, we observe that the Fee Agreement (which superseded the parties' arbitration agreement) does not contain an explicit limitation on the arbitrators' power (*contrast e.g. Matter of Professional Trade Show Servs. v Licensed Ushers & Ticket Takers*, 262 AD2d 42, 44 [1999]; *Matter of State of New York [State Univ. of N.Y., Col. at Buffalo] [United Univ. Professions]*, 150 AD2d 877, 878 [1989], *lv denied* 74 NY2d 612 [1989]).

Indeed, any limitation on an arbitrator's power "must be set forth as part of the arbitration clause itself, for to infer a limitation from the substantive provisions of an agreement containing an arbitration clause . . . , is to involve the courts in the merits of the dispute—interpretation of the contract's provisions—in violation of the legislative mandate [citations omitted]" (*Matter of Silverman*, 61 NY2d at 307; *see also* CPLR 7511 [b] [1]). Accordingly, we find that the limitation urged by the participating tobacco companies is not specifically related to the power of the arbitrator. Therefore, the Supreme Court improperly interjected itself into the merits of the fee dispute (*see Azrielant, supra* [to reach conclusion that arbitration award violated public policy, court engaged in analysis that exceeded the limits of judicial authority in arbitration arena and its finding derived from impermissible second-guessing of factual or legal determinations of arbitrator]). Indeed, to determine whether the arbitrators exceeded their power by awarding attorneys' fees which considered the professional work performed "in connection with" lawsuits other than the Davis/Ellis Action—and which was thus available to further their clients' interest in the Davis/Ellis Action—this Court would likewise become inappropriately involved in the merits of the dispute and second-guess the arbitrators (*see Matter of Local Div. 1179, Amalgamated Tr. Union, AFL-CIO [Green Bus Lines]*, 50 NY2d 1007 [1980] [courts may not overturn award because they believe arbitrator misconstrued apparent, or even obvious, meaning of contract]). Moreover, while, as the tobacco companies contend, there may have been conflicting evidence as to the parties' understanding of "in connection with," it was up to the arbitrators to evaluate and determine which of the conflicting interpretations to accept

(*see Hackett v Milbank, Tweed, Hadley & McCloy*, 86 NY2d 146 [1995]).[9]

Although our finding that the arbitrators did not exceed their power is dispositive of the issue on appeal, we nevertheless observe that the award is neither irrational nor violative of public policy. The majority took great pains to evaluate and calculate counsel's award based on many factors in accordance with the terms of the Fee Agreement. In determining the fee, the majority noted the hearing testimony that it would be inappropriate to assess any fee without taking into account Ellis Counsel's status and unique professional experience and expertise acquired by "being one of the first in the tobacco wars." The majority also considered many other relevant factors in great detail which support the fee award.

Specifically, with respect to risk, the majority found that "[t]he risk was and remained great in 1996," when the Davis/Ellis Action was filed, because up until then "the Tobacco and Cigarette Industry had never paid a penny in settlement or judgment in over 800 actions brought against it during the course of 40 odd years [and] Ellis Private Counsel committed itself to fund personally these actions for whatever amount and for as long as was required."

With respect to complexity, the majority noted that to succeed in the Davis/Ellis action, counsel had to proceed on three fronts: legal, political and public opinion. Moreover, the majority noted that Ellis Counsel "created and developed the addiction liability theory, which the Fifth Circuit . . . referred to as a 'novel and unique' theory."

The majority's findings regarding effort cited, inter alia, counsel's establishment and development of a "Litigation Center" which analyzed, coded and copied onto discs millions of documents. These documents had been used and were to be used further, among other things, in the Davis/Ellis Action.

---

**9.** We note that given the limited scope of judicial review, the record supports the majority's conclusion. The majority opinion cites to specific hearing testimony by the principal negotiator for the states in the MSA (from which the instant fee agreement was modeled) that the words "in connection with" contemplated an expansive meaning to include the totality of the circumstances and overall result. The majority also found it significant that the participating tobacco companies did not move to strike any portion of counsel's fee application, thus buttressing the hearing testimony that the parties had entered into basically the same agreement as had all other parties seeking a fee award through the arbitration process and intended for the panel "to determine the placement of the line circumscribing the work for which Private Counsel would be compensated according to the standards established by the Panel and the Master Settlement Agreement."

Counsel also took 113 depositions of tobacco industry fact witnesses. The majority noted that these discovery efforts were used to the clients' advantage in the Davis/Ellis Action and would have been made part of trial preparation. While motion practice did not particularly benefit plaintiffs in the underlying action, the majority noted that counsel had prepared a comprehensive 296-page trial notebook "with detailed references to key documents that would be used to prove each of the major elements of the case against the Tobacco and Cigarette Industry." Indeed, the majority observed that by the summer of 1998, counsel was "engaged in nonstop trial preparation" for the upcoming trial scheduled for February 5, 1999. Significantly, the Davis/Ellis action had the earliest trial date of any California tobacco case. Even though any trial was unlikely, that trial date was never vacated or set aside, and, therefore, counsel, in order to act in a responsible manner on the clients' behalf, had to prepare on the assumption there would be a trial. This intense trial preparation involved setting up an office in San Diego; identifying exhibits and researching archives; preparing the trial notebook which included 1,426 key documents (culled from millions of industry documents reviewed and coded by Ellis Counsel beginning in 1994).

Regarding achievements, the majority cited Ellis Counsel's efforts and ingenuity in finding key whistle-blowers, one of whom was scheduled to testify in the Davis/Ellis Action as an expert witness on addiction. The majority cited this expert's value to the Davis/Ellis Action. In addition, Ellis Counsel obtained a protective order, which restrained the tobacco industry from destroying, allowing the destruction of, or, in any fashion, altering any document. Although national in scope, the majority cited its potential adverse affect on the Davis/Ellis Action had counsel not obtained the injunction.

Moreover, the majority also cited many instances where counsel was not entitled to a fee or to only a portion of a fee. For example, partial credit was given for work on the June 1997 Accord and the MSA. Since Ellis Counsel freely shared its work product with State Attorneys General, credit for a small portion of that effort was given. Partial credit was given for the discovery and protection of whistle-blowers and the related documents and proposed testimony to be used at the Davis/Ellis trial. The majority did not consider national work long before the Davis/Ellis Action to be "in connection with" the Davis/Ellis effort.

The participating tobacco companies have not met their burden of establishing that judicial intervention is required to

vacate this nonappealable arbitration award. Finally, in light of our determination to reinstate the arbitration award, we need not reach Ellis Counsel's further contention that the Supreme Court erred in vacating the arbitration award as to nonparty Philip Morris Incorporated. Concur—Tom, J.P., Mazzarelli, Andrias, Friedman and Marlow, JJ.