(July 19, 2007)

■ STATE OF NEW YORK et al., Respondents, v PHILIP MORRIS INCORPORATED et al., Appellants, et al., Defendants. [840 NYS2d 55]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered March 13, 2006, which declared the meaning of certain provisions of the parties' Master Settlement Agreement (MSA) and directed the "arbitrator" to modify its determination in accordance with that declaration, unanimously reversed, on the law, without costs, and the order vacated.

In 1998, the major tobacco manufacturers in the United States (the Original Participating Manufacturers or OPMs) entered into the MSA with New York, 45 other states, the District of Columbia, and five island territories (collectively, the Settling States), pursuant to which the companies agreed to advertising and marketing restrictions and to make substantial annual payments, in settlement of claims for the health care costs of treating smoking-related illnesses. Thereafter, about 40 smaller tobacco manufacturers (the Subsequent Participating Manufacturers or SPMs) joined the MSA. Supreme Court entered a consent decree and final judgment approving the MSA.

The MSA imposes a single, nationwide payment obligation on each Participating Manufacturer, allocated among the Settling States in accordance with a percentage based on each manufacturer's market share, as determined by an independent auditor. The base payment obligation is subject to a number of adjust-

ments, including one for Non-Participating Manufacturers (NPMs), which, unburdened by the MSA settlement obligations, may put the Participating Manufacturers at a competitive disadvantage. The NPM adjustment, set forth in article IX (d) of the MSA, reduces the annual payment obligations if (1) the Participating Manufacturers collectively suffer a "Market Share Loss" to the NPMs, as calculated by the Independent Auditor, and (2) the disadvantages suffered under the MSA were a "significant factor" contributing to the market share loss, as determined by a nationally recognized firm of economists (the Firm). Article IX (d) (1) (C) of the MSA further provides that "[t]he determination of the Firm with respect to this issue [significant factor] shall be conclusive and binding upon all parties, and shall be final and non-appealable." The term "Market Share Loss" is defined by the MSA as the difference between market share for the year in question and for 1997 (the last year before the MSA) minus 2%.

Article VII (a) ("Jurisdiction)" of the MSA provides that Supreme Court: "(1) has jurisdiction over the subject matter of the action . . . ; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement . . . ; and (3) except as provided in subsections IX (d), XI (c) and XVII (d) and Exhibit O, shall be the only court to which disputes under this Agreement . . . are presented . . . ." Article VII (c) (1) ("Enforcement of this Agreement") states: "Except as provided in subsections IX (d), XI (c), XVII (d) and Exhibit O, any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (or for a declaration construing any such term ['Declaratory Order']) with respect to disputes, alleged violations or alleged breaches within such Settling State." Thus, article IX (d), pertaining to the Firm's "significant factor" determination, is expressly excepted from the court's jurisdiction and enforcement.

The Settling States and Participating Manufacturers entered into an agreement establishing timetables and procedures for significant factor proceedings. After the parties' initial and final submissions to the Firm, and several rounds of written questions and answers, the Firm would issue a proposed determination, which the parties could comment on or object to before the issuance of a final determination.

With respect to calendar year 2003, the Independent Auditor determined that the Participating Manufacturers had lost 7.95% of the market share, and thus a 5.95% "Market Share Loss" (7.95% minus 2%) for purposes of the MSA. The potential NPM adjustment was calculated to be $1.14 billion.

During the significant factor hearing, the Settling States and Participating Manufacturers submitted to the agreed upon Firm arguments concerning the interpretation of certain terms appearing in the MSA but not defined in that agreement, such as "significant factor" and "disadvantages experienced as a result of the [MSA]." The Firm's proposed determination adopted the interpretations of the Participating Manufacturers and found that disadvantages caused by the MSA were a significant factor in the Market Share Loss. Rather than commenting on the proposed determination, as contemplated by the parties' procedural agreement, New York State sought a declaration from Supreme Court as to the meaning of the contractual terms. Supreme Court ruled that it had jurisdiction and that the MSA's designation of the Firm as the exclusive decision-maker in significant factor proceedings is limited to purely economic issues, leaving the court responsible for resolving issues of contract interpretation. The court then rejected the Firm's interpretation, and directed the Firm to revise its significant factor determination in accordance with the court's construction.*

As set forth *supra,* article VII of the MSA excludes the Firm's significant factor determinations from the court's jurisdiction and enforcement (including declarations construing contract terms), and article IX (d) (1) (c) provides that "[t]he determination of the Firm with respect to this issue [significant factor] shall be conclusive and binding upon all parties, and shall be final and non-appealable." The MSA does not place any limitation on the powers of the Firm, effectively an arbitrator, and therefore Supreme Court should not have intervened in the significant factor proceeding (*see Matter of Brown & Williamson Tobacco Corp. v Chesley,* 7 AD3d 368, 373 [2004]). As we noted on a prior appeal concerning the MSA, "there is a compelling logic to having these disputes handled by a single arbitration panel . . . rather than numerous state and territorial courts," which saves all parties to the agreement from "[t]he chaos that can result from numerous tribunals addressing identical issues

---

* Shortly thereafter, the Firm issued its final determination, "respectfully disagree[ing] with the Court's interpretation," but finding, even under the Court's construction, that disadvantages under the MSA were a significant factor in the Market Share Loss. Although, pursuant to article IX (d) (1) (C) of the MSA, that determination is "conclusive and binding upon all parties, and shall be final and non-appealable," and thus it would appear that the parties' rights would not be directly affected by determination of this appeal, we nonetheless reach the merits, since the dispute is one that is sufficiently likely to recur, might otherwise evade review, and raises a substantial and novel question (*see Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801, 811 [2003], *cert denied* 540 US 1017 [2003]).

with varying results" (*State of New York v Philip Morris Inc.*, 30 AD3d 26, 32 [2006], *affd* 8 NY3d 574 [2007]).

The State had agreed to specific procedural mechanisms in a separate agreement, and by affirmatively requesting the Firm to rule on the instant matters waived its claim that the Firm lacked authority to determine those matters (*see Pharma Consult, Inc. v Nutrition Tech. LLC*, 25 AD3d 421, 422 [2006], *lv denied* 6 NY3d 713 [2006]; *Matter of Peckerman v D & D Assoc.*, 165 AD2d 289, 295 [1991]).

Since the Firm did not exceed a specifically enumerated limitation on its power, and its determination is not violative of a strong public policy or totally irrational, the Firm's award should not have been vacated (*see Matter of Campbell v New York City Tr. Auth.*, 32 AD3d 350, 351 [2006]). Concur—Andrias, J.P., Saxe, Buckley, Gonzalez and McGuire, JJ.