■ In the Matter of the Estate of FREDERICK ROBERT LINKER, Deceased. JOAN LINKER HUFNAGEL, Respondent-Appellant; ELLEN LINKER MARTIN, Appellant-Respondent. [803 NYS2d 534]—

Order, Surrogate's Court, New York County (Eve Preminger, S.), entered on or about December 14, 2004, which directed respondent, as cotrustee, to pay petitioner one half the amount of $708,590 on an account stated, plus attorneys' fees, unanimously reversed, on the law, without costs, and the petition dismissed.

In August 1985, Frederick Robert Linker established an irrevocable inter vivos trust that provided for all income to be distributed to him during his lifetime, with principal and undistributed income, if any, to be divided equally upon his death between his daughters, petitioner and respondent herein. All three were to serve as cotrustees. Any two of the three trustees could make investment decisions as well as bind the trust. Payments from principal for Linker's health and general welfare could be made "at any time or from time to time as the trustees, upon unanimous written consent, shall in their sole and absolute discretion deem necessary."

The trust was to be funded with the proceeds from the sale of stock Linker owned in a closely held corporation. The trust received $2,002,412, consisting of checks in the amount of $80,039 and a promissory note in the principal amount of $1,991,373 with interest of 10% per year. All payments under the note were to be made to the order of Linker, petitioner and respondent, as trustees, and delivered in care of respondent's home address.

Linker died on August 2, 1999. Petitioner filed a petition for

compulsory accounting in March 2002, alleging that respondent had refused to furnish any information as to the administration of the trust to either petitioner or the executor of the estate.

Respondent, while admitting the creation of the trust, the issuance of the promissory note, and receipt of a payment of $457,843, claimed that, notwithstanding the terms of the trust agreement, Linker maintained complete control of the money and that periodic payments she received were turned over to Linker at his insistence. Respondent also claimed that petitioner knew that the trust agreement was not being followed but took no action for over 17 years, even occasionally invading the trust herself and demanding money for her personal benefit.

The court granted the application for a compulsory accounting. Respondent filed an affidavit stating that Linker controlled all of the monies received without any objection from either daughter. She claimed that she did not take control of Linker's finances until 1992, when he requested that she do so due to his declining health. As her records had been previously given to the executor, respondent attempted to reconstruct what she did with the final payment of $1,151,310, received in 1991, without the supporting records.

In July 2003, petitioner commenced another proceeding to take and state respondent's account based upon allegations that respondent breached her fiduciary duty, converted the trust principal and willfully violated the order to account. Respondent once again alleged that Linker completely controlled the funds of the trust with the knowledge and consent of petitioner, thereby precluding the action.

By order dated July 31, 2003, the court directed respondent to file a formal account of her proceedings as trustee. Respondent again filed an affidavit stating that the trust was never funded since Linker took charge of the proceeds from the outset and insisted that the monies were his alone. She further stated this fact was known to petitioner who, as cotrustee and an attorney, never took any action to enforce the agreement, protect trust assets or assert her rights either individually or as cotrustee, and once again stated that all monies and records that she had were turned over to the executor upon Linker's death.

After a second petition to take and state respondent's account was filed in September 2003, the court granted the petition, struck respondent's answer, and referred the matter to a Referee for an inquest.

Petitioner testified that she had no involvement with the investment decisions for the trust as respondent had invest-

ment experience and Linker relied upon her. She stated that she had no concerns about this arrangement but admitted making a number of inquiries about the investments prior to Linker's death. According to petitioner, respondent answered these periodic inquiries by stating that the trust agreement was being followed and that the trust was doing well. Petitioner also stated that she repeatedly asked for records throughout, but her requests were always refused. While she knew as an attorney that she had the right to see the records, both as a cotrustee and beneficiary, she chose not to enforce that right, since she trusted Linker and did not want to create family tensions by commencing an action. Petitioner also stated that she never consented to an invasion of the principal and denied having learned that Linker controlled the monies paid under the note. Significantly, petitioner received a check for $29,000 drawn on Linker's personal account, not the trust account, as well as $10,000 a year for three or four years from Linker, but claimed that she did not know that these later payments were from trust funds.

Respondent's testimony indicated that she was "sure" that petitioner knew that Linker was drawing monies out of the trust account. She had no bank records to support her claim that Linker was in control of the account since the bank only keeps records for seven years. She stated that she did not receive any mail addressed to the trustees for the benefit of the trust until 1990, and did not receive either the initial or installment payments under the note. Respondent did receive the last balloon payment under the note and paid capital gains and income taxes, as well as loans and other debts, owed by Linker. The balance was turned over to the executor.

Respondent argued that the statute of limitations and the doctrine of laches apply since, as early as 1990, petitioner knew that the trust had been repudiated, yet she waited until years later to request an accounting and damages. Respondent claimed that she suffered prejudice as a result of petitioner's delay since documents were no longer available and Linker was dead.

The Referee found that respondent waived the defense of laches and the statute of limitations by failing to assert it at any time prior to the order granting the petition to state an account or the commencement of the inquest. The Referee also found that while respondent attempted to establish that petitioner had borrowed money from Linker and respondent in various transactions unrelated to the trust, and that both daughters received occasional $10,000 gifts from Linker, neither

of these facts demonstrated that petitioner knew that the trust had never been funded, or that any of the gifts derived from the trust account. The Referee further found that respondent did not explain the complete lack of documentation to support her claim that Linker diverted the money under the note to pay his debts and expenses. The court charged respondent with an unaccounted balance of $708,590, half of which should have been distributed to petitioner upon Linker's death, and directed judgment against respondent individually and as cotrustee.

Petitioner's application for damages, prejudgment interest and a surcharge were denied, the court finding that, while her lack of effort did not bar her claims, in her capacity as cotrustee she should have done more to safeguard the trust assets. Petitioner was, however, awarded attorneys' fees.

"Laches and limitations are not the same. Limitations involve the fixed statutory periods within which actions must be brought, while laches signifies a delay independent of statute" (*Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801, 816 [2003]). Laches is "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party" (*id.*). The mere lapse of time, without a showing of prejudice, is insufficient to sustain a claim of laches (*id.*). Prejudice may be demonstrated "by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay" (*Skrodelis v Norbergs,* 272 AD2d 316, 317 [2000]). Here, petitioner, an attorney, was well aware of her rights to obtain documents relating to the trust. Indeed, she had consulted counsel with a view toward commencing an action to compel production of trust documents in 1990, some 12 years before she actually commenced the action for an accounting. Although she argued that she did not want to create family tensions by commencing an action at that time, she failed to take any steps short of litigation to enforce her individual rights as well as her obligations as cotrustee. When she finally did commence proceedings, it was some four years after Linker had died and respondent had turned over all records to the executor of his estate. It should be noted that the executor was removed for apparently misappropriating estate funds.

Respondent consistently claimed throughout the proceedings that documents relating to the trust were turned over to the executor, and that she had no control over them and could not produce them. Bank records, including cancelled checks, were in many instances no longer available. Linker, whom she alleged maintained complete control of the trust and never properly funded it, was deceased. Given the familial relationship between

the three trustees, and uncertainty as to whether the trust was ever properly or fully funded, these records were critical to determining the issues before the Surrogate. Had petitioner acted promptly, both as a trustee in protecting trust assets and as a litigant in asserting her rights, these records may well have been available. Respondent has shown that she was prejudiced by petitioner's delay.

While laches must be pleaded and proved by the party asserting it, respondent's answers to the petitions for a compulsory accounting and to take and state an account, liberally construed (CPLR 3026), alleged petitioner's inaction and acquiescence adequately to have put petitioner and the court on notice that she was raising the defense of laches (CPLR 3013).

In view of the foregoing, it is unnecessary to address respondent's remaining contentions of error. Concur—Marlow, J.P., Ellerin, Nardelli and Sweeny, JJ.