[993 NYS2d 612]

In the Matter of THE EXPLORERS CLUB, INC., Petitioner, v DIAGEO PLC et al., Respondents.

Supreme Court, New York County, August 4, 2014

436

### APPEARANCES OF COUNSEL

*Boies, Schiller & Flexner LLP* (*Joshua I. Schiller* of counsel) for petitioner.

*Quinn Emanuel Urquhart & Sullivan, LLP* (*Robert L. Raskopf* of counsel) for respondents.

### OPINION OF THE COURT

CHARLES E. RAMOS, J.

The Explorers Club, Inc. brings a verified petition for a permanent injunction to bar respondents Diageo plc, Diageo Brands B.V., Diageo Americas Supply, Inc., Diageo North America, Inc., and Diageo Americas, Inc. (collectively, Diageo) from the unlawful use of the Club's name in connection with Diageo's line of whiskies under its Johnnie Walker brand, the "Johnnie Walker Explorers' Club Collection," pursuant to General Business Law § 135.

The Club is a century-old not-for-profit organization dedicated to the advancement of field research and the promotion of exploration, sponsoring expeditions, funding student research, and champions discovery and the wonders of the world (petition ¶ 16). The Club maintains its headquarters in New York and boasts 26 chapters around the world.

To fund its activities, the Club relies on member contributions, fund-raising, and has a history of partnering with like-

minded corporate sponsors who pay to license the Club's name and intellectual property (petition ¶ 22).

The Club owns several federally registered trademarks relating to its name (exhibit G, annexed to Raskopf aff).

The Diageo respondents sell and manufacture various collections of alcohol beverages. Diageo launched the Explorers' Club Collection line of scotch whiskies under its Johnnie Walker brand in 2012 (JWECC). According to the Club, Diageo launched a massive marketing campaign incorporating the Club's name in an effort to affiliate its products with adventure, travel, exploration and discovery. The JWECC line is targeted specifically at international travelers and sold exclusively through duty-free stores or airport clubs that resemble—both in decor and atmosphere—the Club's headquarters in New York (petition ¶¶ 27-36; Bernstein aff ¶¶ 4-5, 8; Stromsvag aff ¶¶ 3-4; Schiller affirmation, exhibits E-G).

The Club alleges that by using the name The Explorers' Club, promoting its products in clubs that resemble the Club's headquarters, and advertising its products by invoking the spirits of exploration, travel, discovery and adventure, Diageo has succeeded in using the name of a charitable organization to obtain a business advantage in violation of General Business Law § 135. The Club alleges that consumers have purchased JWECC products under the mistaken belief that these products were affiliated with the Club itself.

The Club represents that it sought to avoid litigation by notifying Diageo of the Club's exclusive rights to its own name, and by opposing Diageo's attempts to register "Explorers' Club" trademarks before the United States Patent and Trademark Office (USPTO). The parties engaged in settlement negotiations over a 16-month time period and discussed granting Diageo a license to use the Club's name before this proceeding was commenced, however, the parties were unable to reach an amicable resolution.

In response to the petition, Diageo denies that it intended to deceive or derive any benefit from a supposed affiliation with the Club in naming its whisky collection JWECC. Diageo moves to dismiss the petition based upon a pending federal trademark infringement action that the Club commenced in the Southern District of New York against Diageo (federal action), or alternatively, a stay pending resolution of the federal action. Diageo also asserts that this action is barred under the doctrine of laches, and that this court lacks jurisdiction over Diageo plc.

## Discussion

### I. Motion to Dismiss

At the outset, the instant petition for a permanent injunction under General Business Law § 135 and the federal action, a plenary action seeking damages for trademark infringement and unfair competition, do not concern the same relief.

■ The legislature intended General Business Law § 135 to provide a "new and summary proceeding not heretofore available by which an aggrieved party in a proper case, could obtain speedy and drastic relief without the delays incident to a plenary action" (*Association of Contr. Plumbers of City of N.Y. v Contracting Plumbers Assn. of Brooklyn & Queens, Inc.*, 302 NY 495, 498 [1951]). The injunctive relief available in a General Business Law § 135 special proceeding is separate and "not to be confused" with the relief available in a plenary action (*Matter of Industrial Plants Corp. v Industrial Liquidating Co.*, 286 App Div 568, 572 [1st Dept 1955]).

"[S]pecial proceedings in the sense used in the CPLR are unknown in federal courts" (*Saregama India, Ltd. v Mosley*, 2012 WL 955520, *1, 2012 US Dist LEXIS 39322, *4 [SD NY, Mar. 20, 2012, No. 12-mc-45-P1, 11-mc-84-P1]). Rather, a

> "special proceeding is designed to facilitate a 'summary disposition' of the issues . . . and has been described as 'a fast and cheap way to implement a right' that is 'as plenary as an action, culminating in a judgment, but is brought on with the ease, speed and inexpensiveness of a mere motion' " (*Davidson v Capuano*, 792 F2d 275, 279-280 [2d Cir 1986]).

For these reasons, federal courts often decline to exercise supplemental jurisdiction over summary proceedings (*e.g. Morningside Supermarket Corp. v New York State Dept. of Health*, 432 F Supp 2d 334, 346 [SD NY 2006] [CPLR art 78 proceeding]; *Lucchese v Carboni*, 22 F Supp 2d 256 [SD NY 1998] [CPLR art 78 proceeding]). Additionally, one respondent, Diageo Americas Supply, Inc., is a New York corporation, and thus the parties lack complete diversity.

Furthermore, although the parties are the same and there are undoubtedly overlapping facts, the questions of law are separate and distinct. The Club asserts claims in the federal action for trademark infringement, misuse of the Club's name, and trademark dilution under the Lanham Act, and state law claims for unfair competition. Unlike a claim under General Business

Law § 135, the Club's claims in the federal action require a showing that, amongst others, its mark has acquired distinctiveness or a secondary meaning (*Allied Maintenance Corp. v Allied Mech. Trades*, 42 NY2d 538 [1977]). A special proceeding under General Business Law § 135 is available only to benevolent, humane or charitable organizations, and intended to be speedy and efficient, does not require a trial and is decided on affidavits alone (in the absence of triable issues), and may streamline the issues, rather than raise the specter of inconsistent rulings. Simply put, this proceeding and the federal action are entirely different.

Therefore, there is no basis for dismissal of this proceeding in favor of the federal action, or a stay pending resolution of that action (CPLR 2201; *952 Assoc., LLC v Palmer*, 52 AD3d 236, 236-237 [1st Dept 2008]).

A. Laches

■ The court also rejects Diageo's contention that this proceeding is barred by the doctrine of laches. "Laches is an equitable doctrine based on fairness. Courts have invoked the doctrine to prevent stale claims and the prejudice that can result. Whether the doctrine is applicable, however, depends on the facts of the case" (*Continental Cas. Co. v Employers Ins. Co. of Wausau*, 60 AD3d 128, 137 [1st Dept 2008], *lv denied* 13 NY3d 710 [2009]; *Sirico v F.G.G. Prods., Inc.*, 71 AD3d 429, 434 [1st Dept 2010]). Mere lapse of time, without showing of prejudice, disadvantage or injury, is insufficient to sustain a claim of laches (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 817 [2003], *cert denied* 540 US 1017 [2003]; *Matter of Linker*, 23 AD3d 186 [1st Dept 2005]).

Diageo claims that it has been prejudiced by the Club's 16-month delay in bringing this proceeding, during which time the Club was "lying in wait as Diageo invested substantial time and money in building the Johnnie Walker Explorers' Club Collection brand" (Diageo's mem of law at 3). Belying this assertion is uncontested evidence in the record demonstrating that Diageo was on full notice that the Club disputed Diageo's use of the Explorers' Club name, as early as April 2013.

The Club submits an April 18, 2013 cease and desist letter addressed to Diageo's general counsel which states, unequivocally, "We [the Club] have been advised by counsel that your use of our name [the Explorers' Club] may dilute our intellectual property rights and serves to confuse the public" (exhibit P, annexed to Schiller affirmation).

A June 13, 2013 letter from the Club addressed to Diageo plc's general counsel refers to the April 8, 2013 letter and "the Explorers Club infringement," and seeks a meeting to discuss the "use of our name" (exhibit Q, annexed to Schiller affirmation). On July 8, 2013, the Club sent a letter to senior counsel of Diageo North America and made reference to a telephone discussion concerning an "amicable settlement of our dispute relating Diageo's infringement of our mark" (exhibit R, annexed to Schiller affirmation). In August 2013, the Club formally opposed Diageo's trademark application (exhibit F, annexed to Schiller affirmation).

The Club represents, and Diageo does not dispute, that it asserted its rights a mere 23 days after the USPTO published Diageo's registration application for use of the Explorers' Club trademarks for opposition, and two months after becoming aware that Diageo had launched JWECC whisky in the U.S. (*compare NAACP v NAACP Legal Defense & Educ. Fund, Inc.*, 753 F2d 131 [DC Cir 1985], *cert denied* 472 US 1021 [1985] [because of 13 years of delay, national organization was barred by laches from stopping a former local affiliate from using its name]).[1]

Diageo was demonstrably on notice of the Club's dispute concerning Diageo's use of the name Explorers' Club, and Diageo concedes that the parties negotiated over a 16-month period in an attempt to resolve the disputed use, but were unable to reach an agreement. It cannot be deduced from this record that the Club unreasonably neglected to assert its rights. Negotiations regarding Diageo's disputed use of the name were ongoing and might have settled the dispute.

Diageo also cannot credibly claim that it suffered inequity from the supposed delay, as during the 16-month time period the parties were attempting to negotiate a settlement, it has indisputably profited enormously from the purported unlawful and disputed use of the Club's name, to the tune of approximately $50 million in sales (exhibit H, annexed to Schiller affirmation). In any event, Diageo has not articulated how much, if anything, it stands to lose, nor does it contend that it changed its economic position during the period of supposed

---

**1.** On February 19 and 26, 2013, the USPTO published two Explorers' Club trademark applications for opposition (Schiller affirmation). On March 14, 2013, the Club first appeared in the USPTO proceeding to secure an extension of time to oppose Diageo's trademark applications and notified Diageo of its dispute over its use of the name (Schiller affirmation, exhibit B).

delay (*see Saratoga County Chamber of Commerce*, 100 NY2d at 817). In short, Diageo has failed to demonstrate that dismissal on laches grounds is warranted.

B. Lack of Personal Jurisdiction

Diageo claims that this court lacks personal jurisdiction over Diageo plc, which is a holding company and the ultimate corporate parent of the other Diageo respondents, organized under English law with its principal place of business located in London. Diageo avers that Diageo plc is a nondomiciliary that has no New York contacts.

The Club seeks to show that Diageo plc transacted business within this state based upon its parent-subsidiary relationship with the remaining Diageo respondents, in addition to the contention that Diageo plc acted purposefully in New York for its own benefit by claiming ownership of the Johnnie Walker brand and distribution of products associated with this brand in public filings.

Diageo North America, Inc. submits an affidavit from in-house counsel who represents that Diageo plc "had no involvement in the design, manufacture, sales, distribution, or marketing of the JWECC [Explorers Club] consent" (Gourvitz affirmation ¶ 13).

In an attempt to undermine this statement, the Club points to Diageo plc's 2013 annual report stating, "we launched the Johnnie Walker Explorers' Club Collection exclusive to travel retail" (exhibit G, annexed to Schiller affirmation). In Diageo plc's 2013 filing with the Securities and Exchange Commission, it claims ownership of, amongst others, the Johnnie Walker brand (exhibit H, annexed to Schiller affirmation). Diageo plc also states in this filing that it is "responsible for producing, distilling, brewing, bottling, packaging and distributing its brands" (*id.*).

New York's long-arm statute, CPLR 302, enables our courts to acquire personal jurisdiction over foreign corporations not "doing business" here in the traditional sense. It is enough if the cause of action asserted against the defendant corporation arose from its transaction of business in New York—and in such a case, process may be validly served upon the corporation outside of the state (*Public Adm'r of County of N.Y. v Royal Bank of Can.*, 19 NY2d 127 [1967]).

Diageo plc's direct involvement with the Johnnie Walker brand, which includes JWECC, provides a sufficient basis for this court to exercise jurisdiction over it pursuant to CPLR 302

(a) (1), under which a nondomiciliary is subject to jurisdiction for claims arising from a defendant's transaction of business in this state. It is a "single act statute" and proof of one transaction in New York is sufficient to involve jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted (*Kreutter v McFadden Oil Corp.*, 71 NY2d 460, 466 [1988]). Both elements are undoubtably present here.

■ Alternatively, the Club seeks to establish a basis for jurisdiction under CPLR 302 (a) (3) based upon evidence that Diageo plc's subsidiaries (the remaining Diageo respondents) act as its "mere departments," and Diageo plc exercises control over them.

A nonresident parent corporation may be sued in New York when the relationship between the parent and the local subsidiary validly suggests the existence of an agency relationship or the parent controls the subsidiary so completely that the subsidiary may be said to be simply a department of the parent, in which case, the court can conclude that the parent was doing extensive business in this state through its local department separately incorporated as a subsidiary (*Delagi v Volkswagenwerk AG of Wolfsburg, Germany*, 29 NY2d 426 [1972], *rearg denied* 30 NY2d 694 [1972]; *Frummer v Hilton Hotels Intl.*, 19 NY2d 533, 537 [1967], *cert denied* 389 US 923 [1967]; *Taca Intl. Airlines, S.A. v Rolls-Royce of England*, 15 NY2d 97 [1965]; *see e.g. Public Adm'r of County of N.Y.*, 19 NY2d 127).

Beyond a traditional agency relationship, the court may consider factors of common ownership, the financial dependency of the subsidiary on the parent corporation, the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and the degree of control over marketing and operational policies of the subsidiary which is exercised by the parent (*Volkswagenwerk AG. v Beech Aircraft Corp.*, 751 F2d 117 [2d Cir 1984]).

The evidence that the Club submits belies the contention that Diageo plc is merely a holding company, and in fact suggests that Diageo plc is at the helm of a highly integrated enterprise. Diageo plc owns 100% of the equity of respondents Diageo North America, Inc. and Diageo Brands B.V. (exhibit H, annexed to Schiller affirmation). Its chief executive, Ivan Menezes, was appointed to "lead Diageo's operating businesses globally adding

. . . to his current responsibility for North America" (exhibit L, annexed to Schiller affirmation). Upon his appointment as chief executive of Diageo plc in March 2014, Menezes stated that he personally makes the selections and assignments of executive personnel and senior management of the various Diageo subsidiaries including the respondents herein (exhibits K, L, annexed to Schiller affirmation).

Prior to his appointment as chief executive, Menezes served as the president and "Chief operation officer of North America, Diageo plc," while Larry Schwartz, the CEO of three of the respondents in this action, is also listed on Diageo plc's website as serving as the "President, North America Diageo, plc," and is listed as reporting to Menezes (exhibits L, M, N, annexed to Schiller affirmation). Menezes states elsewhere on the site that Diageo plc is directly involved in the marketing and operational policy with respect to Diageo's main brands, which include Johnnie Walker.[2]

Based on the above, it is evident that, beyond common ownership, New York Diageo respondents appear to be doing "all the business which [Diageo plc] could do if it were here by its own officials" (*Frummer*, 19 NY2d at 537). For these reasons, the court finds that the exercise of personal jurisdiction over Diageo plc is proper.

II. General Business Law § 135

> *"No person, society or corporation shall, with intent to acquire or obtain for personal or business purposes a benefit or advantage, assume, adopt or use the name of a benevolent, humane or charitable organization incorporated under the laws of this state, or a name so nearly resembling it as to be calculated to deceive the public with respect to any such corporation . . .* Whenever there shall be an actual or threatened violation of this section, *an application may be made to a court or justice having jurisdiction to issue an injunction,* upon notice to the de-

---

**2.** Menezes states,

"the organization [Diageo plc] has aligned behind the six key performance drivers which I identified when I was appointed CEO; premium core brands [including Johnnie Walker whisky] . . . This clarity of focus enables me to take the changes I have already made to the operating model to the next level. Over the next two months we will set out detailed plans to simplify our processes and de-layer our organization" (Schiller affirmation, exhibit O).

fendant of not less than five days, for an injunction to enjoin and restrain said actual or threatened violation; and if it shall appear to the satisfaction of the court of or justice that the defendant is in fact using the name of a benevolent, humane or charitable organization, incorporated as aforesaid, or a name so nearly resembling it as to be circulated to deceive the public, an injunction may be issued by said court or justice, enjoining and restraining such actual or threatened violation, *without requiring proof that any person has in fact been misled or deceived thereby*" (General Business Law § 135 [emphasis added]).[3]

New York courts have drawn a parallel between summary proceedings under General Business Law § 135 and a motion for summary judgment (*Matter of Industrial Plants Corp. v Industrial Liquidating Co.*, 286 App Div 568, 571-572 [1st Dept 1955]; *Anti-Defamation League of B'nai B'rith v Arab Anti-Defamation League*, 72 Misc 2d 847, 861 [Sup Ct, NY County 1972]). Where issues are identified which require a trial and the taking of proof for their resolution, the summary order should be denied (*Matter of Industrial Plants Corp.*, 286 App Div at 572). Thus, in order to prevail, the petitioner must make a prima facie showing of entitlement to judgment as a matter of law, albeit by resort to affidavit (*Matter of Industrial Plants Corp.*, 286 App Div at 571-572).

█ For the reasons set forth below, the Club has demonstrated its entitlement to judgment as a matter of law as to the three elements of General Business Law § 135: (1) that the Club is a benevolent, humane or charitable organization; (2) that Diageo has used the Club's name or a name so "nearly resembling" the Club's name as to be calculated to deceive the public; and (3) that Diageo acted with the "intent to acquire or obtain for personal or business purposes a benefit or advantage" (General Business Law § 135).

The Club is a not-for-profit corporation under New York's Not-For-Profit Corporation Law (exhibits A, Q, annexed to Schiller affirmation). In 1935, the Club received a determination from the Office of Commissioner of Internal Revenue that the activities and goals of the Club qualified it for federal tax-

---

**3.** Section 948 of the Penal Law of 1909 was the predecessor of General Business Law § 135. Compare General Business Law § 135, which does not require proof that any person has been misled or deceived, with General Business Law § 133 which does require proof.

exempt status (Nichols aff ¶ 21; exhibit I, annexed to Schiller affirmation). Thereafter, the Club's certificate of incorporation was amended to empower the Club to collect charitable donations in order to support its mission (Nichols aff ¶ 22).

Pursuant to the Non-Profit Revitalization Act of 2013 effective as of July 1, 2014, the Club is explicitly categorized as a "charitable organization." The N-PCL defines "charitable corporation" as "any corporation formed, or for the purposes of this chapter, deemed to be formed, for charitable purposes," meaning those "purposes . . . [that are] charitable, educational, religious, scientific, literary, [or] cultural" (N-PCL 102 [3-a], [3-b]).

From its creation in 1904 by a group of prominent explorers, the Club has promoted exploration, science and field research (exhibit O, annexed to Schiller affirmation). The Club supports scientific field research through grant programs that contribute significant funding to individual and group expeditions on a yearly basis for high school and college students dedicated to advancing exploration and scientific knowledge around the world, in addition to providing funding for graduate, post-graduate, doctorate, and early career postdoctoral graduates to help advance their research (Chase aff ¶ 26). The Club receives grant applications from students worldwide, and its grant recipients frequently publish their findings in scholarly journals (Chase aff ¶¶ 29-35).

Club members, as part of the Club's many expeditions, have been among the first to reach both Poles, to summit Mount Everest, to dive to the bottom of the Marianas Trench, and the first to set foot on the moon (petition ¶ 18). According to its president, Alan Nichols, the Club continues to attract individuals who are interested in exploration and field research and has grown to include 26 chapters spanning the globe. In 2013, Club members piloted the first Solar Impulse across the U.S., marking the first solar powered flight across the country (Nichols aff ¶¶ 25, 30). A Club member was recently selected as a finalist for the Mars One mission to establish the first human colony on Mars (Nichols aff ¶ 31).

The Club often selects corporate sponsors who wish to affiliate with the Club's core mission and ethos of exploration and travel (petition ¶ 22). Past corporate sponsors have included Eddie Bauer, Rolex, Land Rover, Redwood Creek wines, and notably, the whisky distiller Whyte & Mackay (Chase aff ¶ 10; Nichols aff ¶ 45).

The Club's agreement with Whyte & Mackay permitted the distillery to use the Club's name and intellectual property in connection with one of its lines of whisky, recreated from whisky brought to Antarctica by the famed explorer Sir Ernest Shackleton in 1907 (Chase aff ¶ 10).

In addition to corporate sponsorships, the Club has been invited to work with national governments and peer institutions to assist in promoting efforts in exploration, conservation, and scientific research (Nichols aff ¶ 37). The Club also maintains sponsorships and informal affiliations with the American Museum of Natural History, the National Geographic Society, the Royal Geographic Society, the American Alpine Club, the Kon-Tiki Museum, and the Cheetah Conservation Fund (Nichols aff ¶ 41).

The Club's mission statement is: "To inspire exploration and protection of wild places from our backwoods to our oceans, mountain peaks and distant galaxies—while sustaining a spirit of fellowship among all explorers" (Nichols aff ¶ 26).

Since 1965, the Club's headquarters have been located at 46 East 70th Street, and features old leather couches, set in a room of wood paneling, and is surrounded by various artifacts of exploration (Bernstein aff ¶¶ 18, 24).

Since the JWECC whisky launched, the Club's president, Alan Nichols, states that the Club has received numerous inquiries regarding an affiliation between the Club and the whisky, including by its own members (Nichols aff ¶ 58; Lucas aff; Bernstein aff).

The chair of the East Asia Chapter of the Club submits an affidavit representing that the similarity of the name and image in an advertisement for the JWECC whisky gave him the "impression that an official sponsorship existed between the Club and Johnnie Walker" (Schwankert aff).

The chair of the Norway Chapter of the Club testified that he has viewed the "large mock clubs that Johnnie Walker (Diageo) uses to promote and sell its Explorers' Club whisky," and "was under the belief that Johnnie Walker had contracted with the Club for the rights to use the Club's name, trademarks, and image to promote and sell its Explorers' Club whiskies" (Stromsvag aff).

A Club member and former board member testifies that he even purchased a bottle of JWECC whisky with the belief that a contractual relationship existed between the Club and Johnnie

Walker permitting Johnnie Walker rights to use the Club's name (Bernstein aff ¶ 1).

The president of the Club testifies that, in a duty-free store in front of a large JWECC display, he asked the sales representative to tell him about JWECC whisky, and whether there was an affiliation with the Club in New York. The representative affirmed that the reference to "Explorers' Club" is indeed a reference to the Club in New York, and that Johnnie Walker whiskies produced under the JWECC line are actually made at the Club's New York headquarters (Nichols aff). The conversation was video recorded and submitted to the court.

Beyond the obvious similarities in the Club's and Diageo's Explorers' Club names are the similarities in imagery invoked by the Club's long-standing traditions and reputations, and by Diageo in its advertisement and marketing strategy. According to a press release, Diageo's Explorers' Club is "blended exclusively for travelers and inspired by rich adventures" (exhibit F, annexed to Schiller affirmation). Diageo's global marketing director states that the Explorers' Club whiskies were "aimed to recalling the golden age of travel and exploration" (exhibit G, annexed to Schiller affirmation).

The Club submits photographic images from its New York headquarters and several of Diageo's JWECC airport displays, from which the resemblance in style, appearance and decor are striking and unmistakable (petition ¶ 33; Schiller affirmation, exhibit H).

Diageo never approached the Club to discuss using its name (Bernstein aff ¶ 7). Instead, Diageo represents that the Johnnie Walker brand has drawn on the Walker family's legacy of travel and exploration in its marketing and product development since before World War I. At the time it launched its new line and chose the name in late 2012, Diageo claims it was totally unaware of the Club's existence (Kennedy aff ¶¶ 9, 29). Diageo conducted a trademark search and did not find any entity previously registered with the trademark for "Explorers' Club" (Kennedy aff ¶ 27).

However, Diageo's insistence that it was unaware of the Club's existence when it chose the name Explorers' Club for one of its Johnnie Walker collections is belied by its own submissions, which demonstrate that it discovered numerous federally registered trademarks owned by the Club when it conducted its trademark search (Raskopf affirmation, exhibit G). In any event, General Business Law § 135, unlike General Business Law

§ 133, does not include the requirement of intent to deceive the public or bad faith (*see Society of War of 1812 v Society of War of 1812*, 46 App Div 568, 573 [1st Dept 1900]; *David B. Findlay, Inc. v Findlay*, 47 Misc 2d 649, 655 [Sup Ct, NY County 1965], *affd* 23 AD2d 846 [1st Dept 1965], *cert denied* 385 US 930 [1966]).

Although Diageo never used the name "the Explorers' Club" in its business until it launched its new line of whisky in 2012, and it may be true that the Walker family has a long-standing heritage of worldwide travel, the Club has nevertheless demonstrated its entitlement to judgment as a matter of law to relief under General Business Law § 135.

The Club has demonstrated that it is a "benevolent, humane or charitable corporation," has been using the name "the Explorers' Club" uninterrupted for nearly a hundred years, and has retained a distinct identity.

Diageo has adopted a nearly identical name as the Club's. In addition to this obvious similarity, the former's tie-ins to the Club's image and reputation of adventure and exploration in its marketing and commercial displays are blatant.

Coupled with Diageo's advertisment of its JWECC products with a heavy emphasis on exploration, travel and adventure, this leads to the inescapable conclusion that there is a connection between them, and that Diageo adopted a "name so nearly resembling [the Club's] as to be calculated to deceive the public" (General Business Law § 135).

Thus, it is clear that Diageo's adoption of the name of the Explorers' Club was "for the purpose of leading the public to believe that it was connected or affiliated" with the Club (*see Matter of Lincoln Ctr for Performing Arts v Lincoln Ctr. Classics, Record Socy.*, 25 Misc 2d 686, 687-688 [Sup Ct, NY County 1960]; *Trustees of Columbia Univ. v Axenfeld*, 136 Misc 831 [Sup Ct, NY County 1930]). Although Johnnie Walker is a liquor brand and the Club is not in the liquor business, the Club frequently establishes corporate affiliations and sponsorships with corporations that wish to promote their goods and services by using the Club's name, reputation and goodwill. Significantly, as stated above, the Club licensed its name and intellectual property to whisky distiller Whyte & Mackay in connection with one of its lines of whisky, recreated from whisky brought to Antarctica by the famed explorer Sir Ernest Shackleton in 1907 (Chase aff ¶ 10; Nichols aff ¶ 45).

The Club has also submitted affidavits from six individuals that Diageo's use of the name Explorers' Club has already deceived members of the public, including its own members.

Otherwise, Diageo has not raised a triable issue of fact in opposition. Diageo submits expert surveys which concluded that JWECC is not likely to confuse the public (Gelb aff). Although the Club submitted evidence that many of its members were confused as to an affiliation, including the one who was told by a sales representative selling the Explorers' Club whisky that the Club actually makes the JWECC whisky at its New York headquarters, a petitioner may obtain relief under General Business Law § 135 "without requiring proof that any person has in fact been misled or deceived thereby." Thus, confusion on the part of the public, or lack thereof, is not dispositive.

The court is also unpersuaded by the argument that General Business Law § 135 applies only to adoption of a charitable name as a corporate name, as opposed to adoption of a charitable name in a product, as here. Diageo has offered no case law to support this contention, nor has it demonstrated that statutory history supports this construction. The text of General Business Law § 135 prohibits "use of the name" of a benevolent, humane or charitable organization, and contains no express language narrowing the prohibition to a particular kind of use, or applying it solely to corporate names.

Moreover, the use of the words "The Explorers' Club" by other persons or corporations is "no shielding defense" to Diageo's use of those words (*New York World's Fair 1939 Inc. v World's Fair News, Inc.*, 163 Misc 661 [Sup Ct, NY County 1937], *affd* 256 App Div 373 [1st Dept], *lv denied* 280 NY 813 [1939]).

Finally, the court has considered Diageo's supplemental affirmation, nevertheless submitted without leave of court, and finds the arguments contained therein unavailing.

Accordingly, the motion to stay or dismiss is denied and the petition is granted.